SHELLABARGER GRAIN PRODUCTS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 109510.  Promulgated June 10, 1943.

*Robert P. Vail, Esq.*, for the petitioner.
*David Altman, Esq.*, for the respondent.

TURNER. *Judge:* The respondent has determined deficiencies of $12,284.86 and $1,163.57, respectively, in the petitioner's income and excess profits taxes for the fiscal year ended September 30, 1938. The issues presented are the correctness of the respondent's action (1) in disallowing dividends paid credit of $67,550 taken by petitioner; (2) in increasing petitioner's taxable income by $8,382.08 as representing income realized by the petitioner on the cancellation of its indebtedness on its promissory note; (3) in disallowing a deduction of $232.37 taken as accrued interest; and (4) in disallowing a deduction of $796.09 taken as a loss sustained on corporate organization expenses as a result of a decision to liquidate and dissolve.

The proceeding was submitted upon a stipulation of facts and an accompanying document. The facts are found as stipulated and shown by the document. For convenience, the discussion of each issue will follow immediately after the statement of facts relating thereto, and the various issues will be considered in the order previously noted.

### Issue 1.—Disallowance of Dividends Paid Credit.

#### STATEMENT OF FACTS.

The petitioner is an Illinois corporation, organized in 1929, and has its principal place of business at Decatur. It reports its income on the accrual basis, with a fiscal year ending on September 30. It filed its income and excess profits tax return for the fiscal year ended September 30, 1938, with the collector of internal revenue at Springfield, Illinois.

The business of the petitioner was the purchase, sale, and manufacture of soy beans and soy bean products. Prior to its fiscal year 1936 its outstanding capital stock consisted of preferred and common stock having an aggregate par and stated value of $154,000. During the said fiscal year the petitioner, in accordance with the procedure provided by Illinois corporation law, reduced its outstanding capital stock to 1,810 shares of common stock of a stated value of $50 per share, or a total of $90,500. This action resulted in the creation of a paid-in surplus of $63,500, or the difference between the original stated capital of $154,000 and the now stated capital of $90,500. At the beginning of the fiscal year 1938 the petitioner's paid-in capital consisted of $90,500 common stock and $63,500 paid-in surplus. At that time the petitioner had no accumulated earnings or profits, but had a deficit of $53,203.27 from operations in prior years. During its fiscal year 1938, and prior to August 11, 1938, the petitioner's outstanding capital

stock was increased by $6,000, representing the proceeds received from 120 shares of its stock which were subscribed and paid for by petitioner's president and principal stockholder at $50 a share. From the time of its organization in 1929 to a distribution made on August 11, 1938. and hereinafter described, the petitioner never declared or paid any dividends.

The minutes of a special meeting of the petitioner's directors held on July 15. 1938. are in part as follows:

The President then stated that if the sale of the company's assets just authorized is consummated, the company will be required to cease doing business, to liquidate its affairs and to dissolve. He stated further that formal dissolution of the corporation would require the action of the shareholders. Thereupon on motion duly made and seconded, it was unanimously

RESOLVED. that the Board of Directors do hereby unanimously recommend that upon the consummation of the sale of the company's property and assets in accordance with the terms of the contract this day approved by the Board of Directors, this corporation be dissolved ; and

BE IT FURTHER RESOLVED that the question of such dissolution be submitted to a vote at a meeting of the shareholders which is hereby called for such purpose, and the proper officers of the company are hereby directed to give notice of such shareholders' meeting or to obtain waivers of notice and consent for the holding of such meeting from all shareholders.

On July 15. 1938. the petitioner entered into a written contract with Spencer Kellogg & Sons. Inc., of Buffalo, New York, providing for the sale of the petitioner's fixed assets. accounts receivable. inventory. and supplies for an agreed cash purchase price of $250,000. subject to adjustment for business done by petitioner from June 1. 1938, to date of closing. The contract required the petitioner to pay all of its liabilities. taxes. etc.. other than those specifically assumed by the purchaser. The contract also contained the following provision:

The Seller [Shellabarger Grain Products Co.], the Stockholders and the Directors hereby agree that upon the consummation of the sale herein the Seller will cease to conduct the business of buying and selling soy beans or of the manufacture or selling soy bean oil, soy bean flour or any of the other products now manufactured or sold by the Seller : that the Seller will be dissolved and liquidated and that all necessary steps will be immediately and promptly taken to make effective and complete the said dissolution and liquidation of the Seller ; that they will not disclose to any person. firm or corporation other than the Buyer any information with reference to the business of the said Seller, its customers. contracts, lists of customers. patents, trade marks, secret processes, etc. to be transferred hereunder nor do anything to interfere with the enjoyment of the business and good will of the Seller to be transferred to the Buyer ; all to the end that the Buyer, its successors and assigns shall have the exclusive, peaceful enjoyment thereof.

The minutes of a special meeting of the petitioner's shareholders held on August 5, 1938. read in part as follows:

The president then stated that under the Company's contract with Spencer Kellogg & Sons. Inc., it would. upon the consummation thereof, be required to cease doing business. to liquidate its affairs and to dissolve. He also called atten-

tion to the resolution of the Board of Directors at its meeting on July 15, 1938, recommending that the Company be dissolved. He also stated that so far as he knew there was nothing to prevent the consummation of the sale to Spencer Kellogg & Sons, Inc., upon August 10, 1938, and that it would be well to pass a resolution voluntarily dissolving the Company since, if for any reason such sale was not consummated. the resolution to dissolve could be rescinded. Thereupon, on motion duly made and seconded and by the affirmative vote of all shareholders of the Company, it was

RESOLVED, that this corporation dissolve voluntarily.

The President then suggested it would be well to hold the meeting open until August 10, 1938, in order to be able to take formal action of the shareholders upon any question or matter which might arise in consummating said contract of July 15, 1938, with Spencer Kellogg & Sons, Inc., and in order also, if the sale provided for by such contract should, for any reason, not be consummated, to rescind the resolution to dissolve the Company.

Thereupon the meeting was adjourned until August 10, 1938, at 2 : 00 o'clock P. M. at 1151–1161 Citizens Building, Decatur, Illinois.

The sale of the petitioner's assets was closed on August 10, 1938, for an aggregate consideration of $262,464.74, resulting in a gain thereon to the petitioner of $45,362.38.

On the same date, August 10, 1938, the directors of the petitioner held a meeting, the minutes of which read in part as follows:

The President stated that formal authorization of the transfer of the insurance policies upon his life would be advisable. Thereupon on motion duly made and seconded, it was unanimously

RESOLVED, that the President and Secretary be and they are hereby authorized in the corporate name and under its seal, to sign, transfer and deliver to Spencer Kellogg and Sons, Inc., a corporation organized and existing under the laws of the State of New York, policies Nos. 860824 and 860825, each for the sum of $10,000 and issued by The Connecticut Mutual Life Insurance Company on the life of William L. Shellabarger, the same being a part of the assets contracted to be sold by the Company to said Spencer Kellogg and Sons, Inc.

The President stated to the Directors that it would be well to distribute as dividends an amount equal to the entire estimated earnings and profits of the Company for the current fiscal year in order that the Company be under no liability for undistributed profits tax. After discussion of the matter, on motion duly made and seconded it was unanimously,

RESOLVED, that a dividend of $35.00 a share be and the same is hereby declared upon the outstanding capital shares of the Company, payable immediately to shareholders of record at this date.

Pursuant to the resolution of the petitioner's directors of August 10, 1938, the petitioner on August 11, 1938, distributed to its shareholders the sum of $67.550. On September 3, 1938, and in accordance with one of the modes for the dissolution of corporations. provided by the Illinois statutes. the shareholders of the petitioner executed a formal agreement reading as follows:

It is agreed by and between all of the shareholders of Shellabarger Grain Products Company, a corporation organized under the laws of the State of Illinois. that said corporation dissolve voluntarily and wind up its affairs, and each of them hereby consents thereto.

Statement of intent to dissolve the petitioner by voluntary consent of shareholders, incorporating the above recited agreement and dated September 6, 1938, was filed with the Secretary of State of Illinois on September 7, 1938, and refiled with the recorder of deeds of Macon County, Illinois, on September 8, 1938, pursuant to statute.

On October 3, 1938, the petitioner's directors adopted a resolution providing that a liquidating dividend and distribution of $35 a share be paid immediately to petitioner's shareholders and that the balance of petitioner's funds be retained as a reserve to meet the remaining liabilities of petitioner until the same could be determined and paid. Pursuant to that resolution the petitioner on the same date distributed $67,550 to its shareholders.

Within less than one year after August 10, 1938, all of the petititioner's liabilities had been finally determined and paid except (1) its undetermined litigation with the Millikin National Bank in a suit, hereinafter considered in another issue, including the costs and expenses of said suit; (2) its liability for income taxes involved in this proceeding; and (3) the expense for filing fees, etc., in connection with its final certificate of dissolution, which has not yet been filed.

Since July 10, 1938, the petitioner has conducted no business whatever except the liquidation and winding up of its affairs. It still holds its corporate charter in good standing. All of the certificates for the petitioner's outstanding 1,930 shares of stock have remained in the hands of its shareholders and to date have neither been canceled nor turned in to petitioner.

In its income and excess profits tax return for its fiscal year 1938 the petitioner reported a net income of $56,259.57. Included in its return was the gain of $45,362.38 realized on the sale of its assets. In said return the petitioner took a dividends paid credit of $67,550 on account of the distribution made on August 11, 1938. In his determination of the deficiency involved herein, the respondent made certain adjustments in the net income reported, some of which are the subject of other issues in this proceeding, and determined the taxable net income to be $65,955.99. He also disallowed the dividends paid credit of $67,550 on the ground that the distribution was in partial liquidation and properly chargeable in its entirety to petitioner's capital account and was not a distribution of earnings or profits under sections 27 (f) and 115 (c) of the Revenue Act of 1936.

In the early part of 1939 the petitioner's auditor and another accountant checked petitioner's books to determine what part, if any, of the distribution made on August 11, 1938, had been paid out of the earnings or profits of the petitioner for its fiscal year 1938. Upon completion of the check, on March 2, 1939, a conference was held between the petitioner's president, its attorney, and the accountants. The accountants stated that according to their computations $24.23

of the $35 per share distribution had been paid out of profits and in their opinion was taxable as an ordinary dividend in the hands of the recipients. Without knowledge as to the correctness of the computations, the attorney disagreed with the opinion of the accountants, taking the position that no part of the distribution was taxable to the shareholders as an ordinary dividend but. after an examination of various sections of the Revenue Act of 1936. expressed the view that there was some question about the matter. The petitioner's president decided to follow the opinion of the accountants. He had the attorney draft a letter to petitioner's shareholders, a copy of which was sent them on March 3. 1939. In that letter the petitioner advised them that of the $35 distribution made to them on August 11, 1938. $24.06 was taxable as a dividend and should be so included in their income tax returns; that the balance of the distribution and all subsequent distributions by petitioner were in the nature of liquidating dividends, were not taxable, and should not be included as income on their returns; that when the final liquidating dividend is paid, the difference between the sum of all liquidating dividends and the cost of the stock would represent a loss; and that if upon audit of the petitioner's return for the fiscal year 1938 by the revenue authorities there should be a change in the petitioner's income for that year, as shown in its return. which would result in a change in the amount of $24.06, they would be promptly notified. The shareholders followed the advice contained in the letter and of the two distributions received by them during the calendar year 1938 of $35 per share each they reported as taxable income only the amount of $24.06 per share of the distribution of $35 per share on August 11, 1938. On February 4, 1942. the petitioner's president and his wife filed amended returns for 1938, reporting as taxable income no part of either of the distributions received by them in that year on their stock in petitioner. Since the issuance of the deficiency notice involved in this proceeding wherein the dividends paid credit taken by petitioner was disallowed, the petitioner's shareholders have filed claims for refund of the tax paid on the portion of the distribution of August 11, 1938, reported as taxable income. The claims are still pending before the respondent.

## OPINION.

Summarizing the facts for a better understanding of the issues presented, the petitioner at the beginning of the taxable year had a deficit of $53,203.27 from operations. Its net income as reported on its return for the year was $56,259.57, all of which was realized on or before August 10. The respondent determined the taxable net income to be $65.955.99. Some of the income items added by respondent, as will be shown through consideration of the issues to follow, are in

dispute. The parties have stipulated that the petitioner's earnings and profits for the taxable year, before any adjustment for Federal income and excess profits taxes accrued for the year, are the same in amount as the correct net income, to be determined in this proceeding, less $456.35 representing unallowable insurance premium expense of the petitioner in respect of policies on the life of its chief officer. Such being the factual situation, petitioner contends that the distribution of $67.550 made by it on August 11, 1938, pursuant to the resolution of its board of directors adopted the preceding day, represented a distribution of all its earnings and profits for the year, and. under section 27 (a) of the Revenue Act of 1936,[1] it is entitled to a dividends paid credit in the amount of the distribution for the purpose of determining adjusted net income subject to the undistributed profits tax.

The respondent contends that the distribution on August 11 was a distribution by the petitioner in partial liquidation and, under section 27 (f) of that act,[2] only so much of the distribution as was "properly chargeable to the earnings or profits accumulated after February 28, 1913," is allowable as a dividends paid credit, and, further, that no part of the said distribution is properly chargeable to earnings or profits.

To support its contention, the petitioner argues that the distribution of August 11 was not a distribution in partial liquidation and that in any event the character of the distribution is determined by the provisions of section 115 (a) and (b) of the statute,[3] which provide that a dividend means any distribution by a corporation to its shareholders out of its earnings or profits accumulated after February 28, 1913, or out of earnings or profits of the taxable year, and that every distribu-

---

[1] SEC. 27. CORPORATION CREDIT FOR DIVIDENDS PAID.

(a) DIVIDENDS PAID CREDIT IN GENERAL.—For the purposes of this title, the dividends paid credit shall be the amount of dividends paid during the taxable year.

[2] (f) DISTRIBUTIONS IN LIQUIDATION.—In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913. shall, for the purposes of computing the dividends paid credit under this section, be treated as a taxable dividend paid.

[3] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this title (except in section 203 (a) (3) and section 207 (c) (1). relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year). without regard to the amount of the earnings and profits at the time the distribution was made.

(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued. before March 1, 1913. may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913. have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113.

tion is made out of earnings or profits to the extent thereof and from the most recently accumulated earnings or profits.

The respondent's argument, on the other hand, is that the distribution falls squarely within the definition of a distribution in partial liquidation as set forth in section 115 (i) of the statute [4] and that the character of the distribution as between capital and earnings or profits must therefore be determined under section 115 (c) of the act, which provides that "In the case of amounts distributed  *  *  *  in partial liquidation  *  *  *  the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits." Applying those provisions, the respondent claims that the earnings and profits of the petitioner for the taxable year must be regarded as having been earned pro rata over the entire year, that, the distribution in question having been made some fifty days prior to the end of the taxable year, all of the earnings or profits realized up to the date of distribution were absorbed by the operating deficit of $53,203.27 existing at the beginning of the year, so that on the date of distribution there were no "earnings or profits accumulated after February 28, 1913," to which any part of the said distribution of August 11 might be "properly chargeable" for the purpose of applying section 27 (f). *supra.*

That the distribution of August 11, 1938, was a distribution in partial liquidation, as definited by section 115 (i), *supra,* is definitely shown by the facts. It follows therefore that the character of the distribution must be determined under section 115 (c), *supra,* and not by section 115 (a) and (b). *supra,* under which the character of distributions by continuing or going corporations are to be determined. *Foster* v. *United States,* 303 U. S. 118. The respondent is also sound in his contention that earnings and profits to the extent necessary to absorb the deficit in capital and paid-in surplus must be regarded as "properly chargeable to capital account" and only the excess regarded as "earnings or profits accumulated after February 28, 1913." See and compare *Edna C. Gutman,* 45 B. T. A. 836; *Roy J. Kinnear,* 36 B. T. A. 153; *Foley Securities Corporation* v. *Commissioner,* 106 Fed. (2d) 731. See also *Hadden* v. *Commissioner,* 49 Fed. (2d) 709; *Arthur C Stifel,* 29 B. T. A. 1145; and *Louise Glassell Shorb,* 22 B. T. A. 644.

Just as the facts plainly show that the distribution of August 11 was a distribution in partial liquidation, as the respondent contends, they also plainly show that all of the petitioner's earnings or profits for the taxable year were realized on or before that date. We accordingly hold that to the extent the earnings or profits of the petitioner

---

[4] (1) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

for the taxable year, computed pursuant to the stipulation of the parties, exceed the deficit in capital and paid-in surplus existing as of the beginning of the taxable year, the petitioner did have earnings or profits available for distribution and is entitled to a dividends paid credit, under section 27 (f), *supra*, to the extent that the distribution of August 11 is properly chargeable to such earnings or profits. Unlike subsections (a) and (b) of section 115, *supra*, which govern distributions by corporations other than distributions in liquidation or partial liquidation and require that such distributions be regarded as having been made from earnings or profits to the extent thereof and from most recently accumulated earnings or profits, subsection (c) prescribes no order as between earnings or profits and capital in so far as distributions in liquidation or partial liquidation are concerned, stating merely that the part of such distributions properly chargeable to capital account shall not be considered a distribution of earnings or profits. Since in the case of distributions in liquidation or partial liquidation the order thereof as between earnings or profits and capital is not fixed by the statute, we know of no better or more accurate way of determining what part of a distirbution in partial liquidation is properly chargeable to capital and what part to earnings or profits than to consider the facts of the particular case and apply as best we can the rule of reason. In *Woodward Investment Co.*, 46 B. T. A. 648, a distribution in partial liquidation of the corporation was made pro rata on all of the outstanding stock without regard to the amount of earnings or profits or of capital available for distribution and without regard to the par or stated value of the stock. It was there concluded that the distribution was properly allocable between capital and earnings or profits in the ratio that each bore to the total of the capital and earnings or profits of the corporation. That case is directly in point and will be followed here in determining the amount of the distribution of August 11, 1938, which is properly chargeable to earnings or profits. To support the proposition that the distribution must first be charged to capital to the extent of paid-in capital and paid-in surplus before any charge to earnings or profits may be made, the respondent relies on *Fowler Brothers & Cox, Inc.*, 47 B. T. A. 103, and *William D. P. Jarvis*, 43 B. T. A. 439; affd., 123 Fed. (2d) 742. In each of those cases, however, the distribution in question effected the complete cancellation and redemption of a specified number of shares of stock, as compared with the pro rata distribution in *Woodward Investment Co.* and in this case on all of the stock, and on the facts in those cases determination of the character of the distribution as between capital and earnings or profits by proration was not necessary or proper.

The Revenue Act of 1942 was enacted after the hearing in this proceeding but prior to the filing of briefs. The petitioner makes no

claim that it was a deficit corporation within the meaning of section 26 (c) (3) as amended by section 501 of the Revenue Act of 1942. Furthermore, an examination of the Illinois corporation law fails to indicate any prohibition against a distribution by a corporation such as the facts show the petitioner to have been during the taxable year of any or all of its earnings or profits. The petitioner does contend, however, that it is entitled to a dividends paid credit under section 26 (f) of the Revenue Act of 1936 as added by section 501 of the Revenue Act of 1942. That section provides that in determining adjusted net income for undistributed profits tax purposes a credit shall be allowed in the "amount by which adjusted net income exceeds the sum of (1) earnings and profits accumulated after February 28, 1913, as of the beginning of the taxable year, and (2) the earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year)." For the purpose of applying that section, the petitioner does not use zero as the amount of its earnings or profits accumulated after February 28, 1913, and existing as of the beginning of the taxable year, but seeks to use the amount of the deficit, $53,203.27, as a minus quantity thereby arriving at an excess of adjusted net income over the earnings existing at the beginning of the year and the earnings of the taxable year. Very clearly, we think, no such application of section 26 (f) was intended. It is apparent from a reading of the statute and the committee reports that it was not designed to deal with problems of a deficit corporation which had already been covered in section 26 (c) (3), *supra*. *Bolivian International Mining Corporation*, 1 T. C. 1110.. The claim for credit under section 26 (f), *supra*, is accordingly denied.

### Issue 2.—Increase in Income on Account of Indebtedness on Promissory Note.

#### STATEMENT OF FACTS.

In March 1933 the petitioner borrowed the principal sum of $50,000 from two banks in Decatur. From one, the Millikin National Bank, sometimes hereinafter referred to as Millikin, it borrowed $28,030.30, and from the other, the Citizens National Bank, sometimes hereinafter referred to as Citizens, it borrowed $21,969.70. The loan in each case was evidenced by the petitioner's note for the amount borrowed. The notes were secured by a single deed of trust on petitioner's real estate, plant, and equipment. The notes were payable on March 23, 1938, and bore interest at the rate of 5 percent per annum to the date of maturity, and if not paid at that time the rate of interest was to be 7 percent per annum from date of maturity until payment.

Subsequently, the note of $28,030.30 to Millikin was further secured by a life insurance policy for $25,000, issued on March 10, 1935, on the life of petitioner's president and made payable to his administrators or assigns. The petitioner paid the premiums on the policy and it was understood that the policy belonged to petitioner. On April 30, 1935, the petitioner's president assigned the policy to Millikin. Similarly two policies for $10,000 each were obtained on the life of petitioner's president and assigned to Citizens. The cash surrender values of the three policies were carried as assets on petitioner's books.

The above mentioned notes were not paid when due on March 23, 1938, and the time of payment was extended to September 23, 1938, at the interest rate of 5 percent per annum. No question of the petitioner's solvency during tis taxable year 1938 is involved in this proceeding.

On June 25, 1938, the petitioner's president, accompanied by its attorney, conferred with two of the officers of Millikin and an agreement was reached that petitioner could satisfy its note for $28,030.30, plus accrued interest to date, for a cash payment of $20,000, provided that at the same time the petitioner paid in full another of its notes held by Millikin but not involved in this proceeding. With funds which he had personally borrowed but were repaid to him by petitioner later in the taxable year, petitioner's president on June 25, 1938, paid to Millikin $20,000. Upon receipt of such payment and the payment in full of the other note. Millikin marked the petitioner's note for $28,030.30 paid (the payment of $20,000 being $8,382.08 less than the principal amount of said note with interest accrued to that date) and surrendered it to petitioner's president as agent and chief officer of petitioner. For some undisclosed reason, neither petitioner's president nor its attorney requested Millikin to return the $25,000 insurance policy at the time of the payment and surrender of the notes. With respect to the foregoing transaction the petitioner, under date of June 25, 1938, made an entry on its books by which, among other things, it debited accrued interest on the note in the amount of $351.78 and credited gain and loss in the amount of $8,382.08.

On July 18, 1938, three days after it had entered into an agreement to sell its assets, the petitioner paid in full its note of $21,969.70 held by Citizens, which marked it paid and surrendered it on the same date. Upon receiving that note the petitioner took it, and the one that had been given to Millikin, to the trustee under the deed of trust, and the trustee thereupon executed a release of the deed of trust which petitioner on the same day, July 18, 1938, caused to be made a matter of public record. On July 19, 1938, Citizens reassigned to petitioner's president the two insurance policies on his life which it theretofore had held as collateral. He thereafter assigned them to petitioner,

which, on August 10, 1938, assigned and delivered them, as a part of the assets sold, to the purchaser of its assets.

On July 18, 1938, the day the petitioner paid its note in full to Citizens, the attorney for Millikin made demand on the attorney for petitioner for the payment of the $8,382.08 heretofore mentioned. Petitioner's attorney, in behalf of petitioner, denied liability and refused payment. On the following day the petitioner's attorney made demand on Millikin for the reassignment and surrender of the $25,000 insurance policy heretofore mentioned. At this time the petitioner was not, except for possible liability for the said $8,382.08, indebted to the bank. The bank refused to surrender the policy, which had a cash value of approximately $960, on the ground that it was holding the policy as collateral for the alleged unpaid balance of the $28,030.30 note. The bank still has possession of the policy.

On August 24, 1938, and after the sale by petitioner of its assets, Millikin brought suit against petitioner and its shareholders for the sum of $8,382.08 plus $232.37 additional interest alleged to be due at the time of filing the complaint. The suit was grounded on the allegation that petitioner had fraudulently obtained the cancellation of the note and the release of the unpaid portion of the indebtedness by reason of the false and wrongful representation of its agents, who represented that in order to meet its indebtedness petitioner had attempted to sell its plant and properties but was unable to do so; that in order to remain in business petitioner was attempting to obtain funds to refinance its indebtedness through a party in Chicago; and that said party required as a condition precedent the discounting of the indebtedness owed by petitioner to Millikin; whereas the fact was that on June 25, 1938, and for some time prior thereto, petitioner was negotiating the sale of its assets and property to Spencer Kellogg & Sons, Inc., for approximately $250,000, which was a sufficient amount to pay all of petitioner's outstanding indebtedness, including what it owed Millikin, and leave approximately $70,000 for distribution to petitioner's shareholders; and that as a consummation of such negotiations the petitioner had on August 10, 1938, disposed of its assets and property to said company. On October 27, 1938, Millikin filed an amended complaint, which was followed successively by petitioner filing its answer, Milliken filing a reply, and petitioner filing a rejoinder. In the last named pleading petitioner denied all allegations of fraud and misrepresentation; admitted that prior to June 25, 1938, it had entered into negotiations with Spencer Kellogg & Sons, Inc., for the sale of its assets; but denied that it had concealed such negotiations from Milliken for the purpose of misleading it. The suit was tried in December 1940 and the jury rendered a verdict for petitioner. However, the presiding judge set aside the verdict and granted Milliken's motion for a new trial. The suit is still pending.

In closing its books for its taxable year 1938 and on account of the Milliken suit, the petitioner debited profit and loss with the amount of $8.614.45, $8,030.30 of which was for the principal of the mortgage and $584.15 was with respect to interest thereon as involved in the suit. The $584.15 was composed of $351.78 representing accrued interest on the note from March 23 to June 25, 1938, and $232.37 representing additional interest claimed to be owing to the date of the suit.

In its return for 1938 petitioner did not report any amount as income with respect to the transaction of June 25. 1938, but took a deduction of $351.78 as interest accrued from March 23 to June 25. 1938.

In determining the deficiency involved herein the respondent increased petitioner's gross income by the amount of $8,382.08 as representing the income realized by petitioner upon the satisfaction of its indebtedness on the note held by Millikin for less than face value and allowed the deduction of $351.78 taken by petitioner as interest accrued from March 23 to June 25, 1938.

OPINION.

The respondent takes the position that by reason of the partial cancellation of the Millikin note on June 25, 1938, the petitioner, under the doctrine of *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, must be regarded as having realized gain to the extent that the indebtedness was canceled, there being no claim or contention that the petitioner was insolvent. He argues, citing *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, that such realization of gain is in no way affected or nullified by the subsequent suit by Millikin to recover the amount of the indebtedness canceled, which suit is being contested by the petitioner and is as yet undetermined. Even though we assume that the doctrine of *North American Oil Consolidated* v. *Burnet* is applicable and that full force and effect must be accorded the cancellation of June 25, 1938, as if no dispute in respect thereto had thereafter arisen, we are of the opinion and hold that the issue must be resolved in favor of the petitioner and against the respondent. Since the hearing in this proceeding and the submission of briefs herein, the Supreme Court has handed down its decision in *Helvering* v. *American Dental Co.*, 318 U. S. 322, wherein it was held that the cancellation of accrued rent and interest by a creditor of the taxpayer in respect of which the taxpayer had had in a prior year the benefit of a deduction in determining its taxable net income was not the realization of taxable gain in the year of cancellation but a gift to the taxpayer by its creditor. The Supreme Court did not overrule *United States* v. *Kirby Lumber Co.* but apparently recognized some distinguishing differences. The instant case, on its facts, has some features of both *United States* v. *Kirby Lumber Co.* and *Helvering* v. *American Dental Co.* Regardless, however, of any facts herein which

88

may make the instant case to some extent comparable to *United States* v. *Kirby Lumber Co.*, what was said by the Supreme Court in *Helvering* v. *American Dental Co.* is in our opinion wholly applicable to the instant case, and, inasmuch as *Helvering* v. *American Dental Co.* represents the latest pronouncement by the Supreme Court in cases such as we have here, we regard it as controlling and conclude that the petitioner realized no income from the partial cancellation of the note and interest.

Inasmuch as the respondent's allowance of the deduction of $351.78 as interest accrued from March 23 to June 25, 1938, the date of cancellation, was coupled with his determination that gain was realized in that amount as the result of the cancellation of the indebtedness on the note, including both principal and interest, in excess of $20,000, our prior determination as to the effect of the cancellation of such indebtedness requires the disallowance or elimination of the interest deduction so allowed. The interest which had accrued up to June 25, 1938, was not paid but was eliminated by cancellation and the likelihood that it will ever be paid as a result of the suit by Millikin, which is being strenuously contested by the petitioner, is not such as to justify a reaccrual thereof.

*Issue 3.—Disallowance of Deduction Taken for Accrued Interest.*

STATEMENT OF FACTS.

The petitioner, on June 25, 1938, was indebted to Millikin in the amount of $28,382.08 on its note given in 1933. Of that amount, $28,030.30 represented the principal of the note and $351.78 represented accrued interest to that date. In filing its suit Millikin sought judgment for $8,614.45, composed of $8,030.30 representing the portion of the original principal of the note that was not paid by petitioner, $351.78 representing interest accrued to June 25, 1938, and $232.37 claimed as additional interest to the date of the suit. The petitioner charged the $232.37 to expense on its books and took a deduction therefor in its return for 1938. The respondent disallowed the deduction on the ground that it represented merely a contingent reserve and did not represent interest accrued within the taxable year on any indebtedness.

Aside from the assignment of error in its petition to the respondent's disallowance of the deduction, the petitioner makes no claim respecting the allowability of the deduction, and we accordingly assume that it has abandoned the issue. At any rate, an allowance of the deduction is not permissible, under the rule that a taxpayer is not entitled, prior to adjudication or other disposition, to take a deduction for an amount representing a claim the validity of which he denies.

## Issue 4.—Disallowance of Deduction for Organization Expense.

### STATEMENT OF FACTS.

At the end of its fiscal year 1937 the petitioner carried on its books as an asset an item of $796.09 representing organization expense incurred in 1929 and 1930. In closing its books for that year it eliminated the item from its accounts by a charge to surplus. In closing its books for the taxable year 1938 the petitioner restored the item to its accounts by a credit to surplus, and in its income tax return for that year it took a deduction of the said amount. The deduction was disallowed by the respondent on the ground that petitioner was not dissolved and did not abandon its corporate franchise during that year.

### OPINION.

While the respondent makes the point that the evidence does not show whether the petitioner claimed the $796.09 as a deduction in its return for 1937, the year in which it was charged to surplus, he makes no contention that it was so claimed as a deduction, and we deem it unnecessary to consider the point. The respondent does contend, however, that the petitioner was not completely liquidated and did not abandon its corporate charter during the taxable year and therefore was not entitled to deduct the organization expense in controversy.

The statutes of Illinois provide that when a corporation files with the secretary of state a statement of intent to dissolve, it shall cease to carry on its business except in so far as necessary to wind up its affairs, but that its existence shall continue (1) until certificate of dissolution has been issued by the secretary of state, at which time the existence of the corporation shall cease, or (2) until a decree of dissolution has been entered by a court of equity, a situation not here material. A certificate of dissolution is issued only after all debts, liabilities, and obligations of the corporation have been discharged or adequate provision has been made therefor; all the remaining assets have been distributed to the shareholders; and the proper officers of the corporation have filed with the secretary of state articles of dissolution attesting to such facts and the fact that no suits are pending against the corporation in any court. Jones Illinois Statutes, Ann., vol. 5, secs. 32,080,-32.083.

In the early part of September 1938, when it filed its statement of intent to dissolve, the petitioner lost its right to carry on business except to the extent necessary to wind up its affairs, and since that time the petitioner has carried on no business except that related to the winding up of its affairs. Although under the Illinois statutes the petitioner's corporate existence continues until the issuance of a certificate

of dissolution by the secretary of state after the completion of the winding up of its affairs, such existence is limited to a specific activity, namely, the winding up of its affairs. The situation here is similar to that in *Liquidating Co.*, 33 B. T. A. 1173. The taxpayer in that case was a Delaware corporation. Pursuant to the law of that state the secretary of state in 1929, after the corporation's compliance with certain requirements, issued a certificate of dissolution. Under the law the corporate existence was nevertheless continued for a period of three years thereafter for the purpose of liquidating its affairs, but not for carrying on any other business. In that case it was held that the corporation lost its right to transact its regular business in 1929; in reality surrendered its charter in that year; and was entitled to take a deduction in that year of certain expenditures incurred in connection with its organization. Our holding there is applicable here, and we therefore sustain the petitioner on this issue.

*Decision will be entered under Rule 50.*