RONALD D. ANDERSON AND MARILYN J. ANDERSON,
PETITIONERS *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 1727–74.   Filed December 22, 1976.

*Robert A. Schnur,* for the petitioners.
*Joseph R. Peters* and *John J. Reid,* for the respondent.

### OPINION

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1971 in the amount of $539.83. The ultimate issue for our decision is the extent, if any, to which corporate distributions received by petitioners with respect to their stock in the distributing corporation constituted dividends to them taxable in the year of receipt as ordinary income. This ultimate issue depends upon the extent that such distributions were made out of the distributing corporation's earnings and profits and this determination depends principally upon a resolution of the following issues:[1]

(1) What is the correct method for determining the proper charge to a corporation's capital account under section 312(e), I.R.C. 1954,[2] and the resulting charge to its earnings and profits as a result of a section 302(a) redemption distribution;

---

[1] Certain concessions have been made by both parties, the effect of which will be reflected in the Rule 155 computation.

[2] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

(2) On the assumption that the exercise of a stock option issued pursuant to section 422 generates a reduction in corporate earnings and profits by the difference between the fair market value of the stock at the date of exercise and the option price, which corporation is entitled to this reduction, the issuing corporation or the employer corporation, when a parent issues the stock to employees of its subsidiary; and

(3) When a corporation begins a taxable year with no accumulated earnings and profits but generates earnings and profits during said year and makes two categories of distributions to its shareholders during the year, ordinary cash distributions and a section 302(a) redemption distribution, the sum of which exceeds the amount of the current earnings, which category of distributions, if either, is to be given priority as a charge against said current earnings and profits.

This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts together with associated exhibits attached thereto are incorporated herein by this reference. The facts are summarized herein, where appropriate.

Petitioners Ronald D. Anderson and Marilyn J. Anderson (hereinafter referred to as petitioners), husband and wife, resided at Wauwatosa, Wis., when they filed their 1971 joint income tax return (Form 1040), as well as when they filed the petition herein.

Petitioners filed their joint Federal income tax return for the year 1971 with the Midwest Service Center of the Internal Revenue Service at Kansas City, Mo.

American Appraisal Associates, Inc. (hereinafter referred to as Associates), is a Delaware corporation with its principal offices at Milwaukee, Wis. Associates files its corporate income tax returns on the basis of a fiscal year ending March 31. Associates had one class of stock, common stock, which is traded over the counter. The number of Associates' shareholders and the approximate number of its outstanding shares of common stock as of March 31, 1970, 1971, and 1972, are as follows:

| FYE Mar. 31— | Shareholders | Shares outstanding |
|---|---|---|
| 1970 | 299 | 114,160 |
| 1971 | 322 | 113,240 |
| [3]1972 | 1,052 | 1,810,000 |

As of January 1, 1971, petitioners owned individually or jointly 250 shares of Associates' common stock, which increased to 3,750 shares after the 15-for-1 split on April 28, 1971. Petitioners acquired no additional shares of Associates during 1971 and, on June 21, 1971, they sold 700 of their shares. During 1971, petitioners received the following cash distributions from Associates with respect to the shares owned by them on the indicated payment dates:

| Payment date | Amount | Payment date | Amount |
|---|---|---|---|
| Feb. 9, 1971 | $437.51 | July 30, 1971 | $320.25 |
| Apr. 13, 1971 | 499.99 | Nov. 10, 1971 | 320.25 |
| | | | 1,578.00 |

On each of the above-described payment dates, the adjusted basis of the petitioners in each of their shares of Associates' stock exceeded the amount of the distribution made to them on such date with respect to such share.

On their 1971 income tax return, petitioners reported the above-described distributions as follows:

| Payment date | Reported as taxable dividend (before sec. 116 exclusion) | Reported as nontaxable distribution |
|---|---|---|
| Feb. 9, 1971 | — (0%) | $437.51 (100%) |
| Apr. 13, 1971 | $4.99 (1%) | 495.00 ( 99%) |
| July 30, 1971 | 3.20 (1%) | 317.05 ( 99%) |
| Nov. 10, 1971 | 3.20 (1%) | 317.05 ( 99%) |
| | [1]11.39 | [2]1,566.61 |

[1] Rounded to $12.
[2] Rounded to $1,566.

This manner of reporting the distributions was based on advice received by petitioners from Associates that (a) no portion of the distribution made by Associates to its shareholders on February 9, 1971, constituted a distribution out of

[3] On Apr. 28, 1971, the common stock of Associates was split 15-for-1, and 14 new shares were issued as a stock dividend for every share outstanding on that date.

Associates' current or accumulated earnings and profits within the meaning of section 316, and (b) only 1 percent of the distributions made by Associates to its shareholders on April 13, July 30, and November 10, 1971, constituted a distribution out of Associates' current or accumulated earnings and profits within the meaning of section 316.

Respondent, in his notice of deficiency dated February 13, 1974, determined that all of the $1,578 in distributions received by petitioners from Associates in 1971 should have been reported as taxable dividends; accordingly, respondent increased petitioners' taxable income by $1,378 (the amount of the distributions minus the $200 exclusion permitted by section 116), resulting in an income tax deficiency of $539.83. This adjustment was based on respondent's position that the entire amount of the distributions received by petitioners from Associates in 1971 constituted distributions out of Associates' current or accumulated earnings and profits within the meaning of section 316.

The sole issue we must decide is what portion of the cash distributions made by Associates to petitioners during the calendar year 1971 was taxable as dividends to them. However, to reach this decision it is necessary to first determine the effect on the earnings and profits of Associates and several of its subsidiaries of various transactions occurring during the applicable years.

Section 301(a)[4] provides as a general rule that a distribution of property from a corporation to a shareholder shall be treated as provided in subsection (c). Under subsection (c)(1)[5] "that portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income."[6] In general terms, section 316 defines a dividend as a distribution

---

[4] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

[5] (c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

[6] The parties have stipulated that petitioners' basis in each share of the Associates' stock exceeded the amount of distributions received with respect to the stock. Consequently, to the extent that any of the distributions are found not to constitute dividends, they shall constitute tax-free returns of capital pursuant to sec. 301(c)(2).

by a corporation out of its earnings and profits and contains a presumption that all distributions are made from earnings and profits, to the extent thereof, unless otherwise provided. Obviously the key to the resolution of this case is the amount of Associates' earnings and profits at the time of the concerned distributions. While all four of the distributions received by petitioners were made during the calendar year 1971, Associates computes its income and determines its earnings and profits on the basis of a fiscal year ending March 31. Since the first distribution was made on February 9 and the remainder made after March 31, we must determine the status of Associates' earnings and profits for 2 years, fiscal year ending March 31, 1971, and fiscal year ending March 31, 1972 (hereafter sometimes collectively referred to as the computation years).

The statutory phrase "earnings and profits" is nowhere defined in the Code and a shorthand explanation thereof is difficult.[7] For purposes of this discussion, earnings and profits may be thought of as a tax accounting concept utilized to determine the tax consequences of corporate distributions to shareholders. Section 312 is the only statutory guide to a meaning of this phrase and basically this section describes the effect on earnings and profits as a result of various corporate transactions in the course of operations. The transactions of concern to us in determining Associates' earnings and profits are limited to those which form the issues at controversy herein; except for the effect of those issues, Associates' earnings and profits have been stipulated. However, the computation of Associates' earnings and profits is complicated by the fact that during the computation years Associates was the parent member of an affiliated group (as defined in section 1504(a)) of five corporations. Associates' earnings and profits were affected by some of the actions of those related corporations.

Associates was organized on February 25, 1970, and became active as of April 1, 1970; at that date Associates had no earnings and profits.

---

[7] See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.03 (3d ed. 1971), for a discussion of earnings and profits and cases and articles cited therein.

On April 1, 1970, Associates acquired, in tax-free reorganizations, the American Appraisal Co. and Cole-Layer-Trumble Co. The acquisition of the American Appraisal Co. (Old TAACO) was accomplished by a merger of that corporation into Associates and a transfer by Associates of all the merging corporation's assets into a new subsidiary, the American Appraisal Co., Inc. (New TAACO). This acquisition constituted a tax-free reorganization within the meaning of sections 368(a)(1)(A) and 368(a)(2)(C). The acquisition of Cole-Layer-Trumble Co. (CLT) was accomplished by a tax-free exchange of shares of Associates for all the outstanding shares of the acquired corporation; the acquisition constituted a tax-free reorganization within the meaning of section 368(a)(1)(B). At the time of its acquisition by Associates, Old TAACO owned all of the outstanding shares of Standard Research Consultants, Inc. (SRC). These shares were acquired by Associates and distributed to New TAACO pursuant to the April 1, 1970, reorganization and, throughout the taxable years involved in this case, SRC continued as a wholly owned subsidiary of New TAACO. On November 2, 1970, Associates acquired all of the outstanding shares of Stone & Youngberg Municipal Financing Consultants, Inc. (S. & Y.). None of these acquisitions resulted in any of the earnings and profits of the acquired corporations being deemed received or retained by Associates.

As noted previously, during the fiscal years ending March 31, 1971, and March 31, 1972, Associates, New TAACO, CLT, SRC, and S. & Y. constituted an "affiliated group" of corporations as defined under section 1504(a). And as permitted by section 1501, Associates, as common parent, filed consolidated tax returns on behalf of said group for each of those taxable years. During the computation years, Associates received cash distributions from CLT, New TAACO, and S. & Y. These distributions are significant herein and are the source of the added complexity in computing Associates' earnings and profits. Section 1.1502–33(c)(1), Income Tax Regs., provides that dividend distributions from one member (of an affiliated group) to another member are to be reflected in the distributee's earnings and profits.[8] Thus, to compute

---

[8] At no time during its taxable years ended Mar. 31, 1971 and 1972, did Associates

Associates' earnings and profits, we must first determine whether or to what extent distributions from CLT, New TAACO, and S. & Y. were dividend distributions and perforce the status of the subsidiaries' respective earnings and profits accounts during the computation years.

The logical approach to follow in making these determinations is to focus upon CLT, New TAACO, and S. & Y., individually, and determine the status of the distributions made by each for both of the computation years. Indeed, this is the manner in which the computation under Rule 155 will proceed; however, a sequential analysis herein of the relevant facts and legal issues is not possible.

Section 316(a)[9] defines a dividend in terms of both accumulated earnings and profits and current earnings and profits; the former is a historical concept. In this case it is necessary to determine the accumulated earnings and profits of a number of corporations for a number of taxable years. There are three controverted legal issues involved in this case. Our discussion of each issue will include a description of the factual occurrences giving rise to the controversy, an analysis of the relevant legal principles, and resolution of the question raised. Only after resolution of the first and second issues can the earnings and profits of CLT, New TAACO, and S. & Y. be

---

or its subsidiaries make the election provided in sec. 1.1502–33(c)(4)(iii), Income Tax Regs.

We also note that under sec. 1.1502–33(c)(2), Income Tax Regs., even if the distributions from the subsidiaries were not from earnings and profits still they may serve to increase Associates' earnings and profits if they exceed Associates' basis in the stock of the subsidiaries. The parties have failed to stipulate the amount of Associates' basis in the subsidiaries' stock and if necessary must do so in the Rule 155 computation.

[9] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

    (1) out of its earnings and profits accumulated after February 28, 1913, or

    (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

computed and the effect of those corporations' distributions to Associates be determined. The final issue relates solely to Associates and its resolution will then permit a determination of the ultimate issue, whether or not petitioners are liable for the proposed deficiency in their 1971 income tax. The decision in this case will be entered under Rule 155, and all relevant computations will be made thereunder in accordance with our findings.

## Issue 1

The legal issue we must first decide is what portion of a redemption distribution, described in section 302(a), is properly chargeable to earnings and profits pursuant to section 312(e) and (a). This issue is directly relevant to two separate factual situations, both involving CLT.[10]

(a) *CLT common stock redemption.*—As of April 1, 1968, the beginning of its taxable year ended March 31, 1969, CLT had accumulated earnings and profits of $789,305 within the meaning of section 316(a)(1). During this year CLT had current earnings and profits of $758,568 before taking into account dividend distributions in the amount of $60,691 made to shareholders during the year and the redemption distribution described below. Immediately prior to the common stock redemption, CLT had outstanding the following shares of stock which possessed the indicated characteristics:

(i) 2,500 shares of $1 par value class A common stock ($2,500) with paid-in capital of $16,704 attributable thereto.

(ii) 7,500 shares of $1 par value class B common stock ($7,500) with paid-in capital of $50,110 attributable thereto.

(iii) 1,710 shares of $100 par value preferred stock ($171,000) with no paid-in capital attributable thereto.

*Voting.* Voting rights were vested exclusively in the holders of the class A common stock, except under certain limited circumstances.

---

[10] This issue is also raised by a stock redemption undertaken by Associates on Mar. 31, 1971. However, on brief respondent claims to have inadvertently stipulated to the amount of Associates' capital account at the time of the redemption. Respondent states that this amount does not represent his position as to the meaning of capital account but due to the stipulation, respondent concedes this issue as it relates to Associates' redemption.

*Preemptive rights.* Only holders of class A common stock had preemptive rights with respect to future stock offerings.

*Liquidation rights.* Upon dissolution, the holders of preferred stock were entitled to receive $100 per share (plus any dividend arrearages) before any payment was made to the holders of common stock. Thereafter, the holders of the common stock, class A and class B, were to receive up to $100 a share and, when that was paid, all holders of preferred stock, class A stock and class B stock, were to share equally in further distributions.

*Redemption rights.* CLT had the right at any time to redeem the outstanding preferred stock, subject to certain procedural requirements. Such redemption was to be effected by the exchanging for each redeemed share of preferred stock either one share of class A common stock or $100 plus all dividend arrearages plus a pro rata portion (with all shares, common and preferred, to be considered as equal) of the excess of CLT's earned surplus at the time of redemption over that earned surplus at the time of issuance.

*Dividends.* The holders of shares of preferred stock were entitled to receive dividends of 4½ percent per year, before any dividends were paid to the common shareholders. This dividend was cumulative, so that any deficiency therein was to be made good before any common stock dividends were paid. After the preferred stock dividend requirement was satisfied, dividends could be paid on either the class B common stock, or equally upon the class A and class B common stock. The preferred stock was participating, so that, after dividends of $4.50 were paid on the class B common stock, any further dividends on the class B common stock were to be paid equally on the preferred stock.

On December 15, 1968,[11] CLT distributed $510,000 to one of its shareholders in redemption of 425 shares of class A common stock and 1,275 shares of class B common stock. CLT treated this distribution as one which came within the general rule of section 302(a)[12] and thus applied the special

---

[11] In the stipulation of facts the parties stated that the redemption was made in December 1968; on brief they treat Dec. 15, 1968, as the date of redemption.

[12] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such

rule provisions of section 312(e) in determining the resulting effect on its earnings and profits.[13] Respondent agrees that section 312(e) is the provision applicable in determining the effect of the distribution on CLT's earnings and profits, but the parties disagree on the manner in which this subsection operates.

Section 312(e) provides:

(e) SPECIAL RULE FOR PARTIAL LIQUIDATIONS AND CERTAIN REDEMPTIONS.—In the case of amounts distributed in partial liquidation (whether before, on, or after June 22, 1954) or in a redemption to which section 302(a) or 303 applies, the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits.

Neither the meaning of "capital account" nor the procedure for determining what part of a distribution is "properly chargeable" thereto is included in the Code or the regulations.

CLT applied section 312(e) as follows:

The 1,700 shares redeemed (425 class A shares and 1,275 class B shares) represented 17 percent of the outstanding common stock. CLT debited its corporate books accordingly:

| | |
|---|---|
| Stated capital—class A common | $425 (17% of $2,500) |
| Stated capital—class B common | 1,275 (17% of $7,500) |
| Paid-in capital | 11,358 (17% of $66,814) |
| Retained earnings | 496,941 |
| Total charge | 510,000 (rounded) |

For tax purposes, CLT accounted for the transaction in the same manner, i.e., CLT treated the term "capital account" as meaning total capital contributed by the shareholders with respect to the class(es) of stock redeemed. CLT determined

redemption shall be treated as a distribution in part or full payment in exchange for the stock.

In this case, where the distributor corporation made a cash distribution, whether or not the distribution came within the scope of sec. 302(a) has no specific tax significance to the corporation other than invoking the sec. 312(e) exception for earnings and profits purposes; however, the tax treatment to the redeemed shareholder is significant in that he is provided sale or exchange treatment on the occurrence rather than dividend treatment. Although the parties did not stipulate that this transaction was governed by sec. 302(a), their arguments and earnings and profits computations were premised upon such fact.

[13] Sec. 312(a) provides that as a general rule on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation shall be reduced by the amount of the money distributed. An exception to the general rule is contained in sec. 312(e) for cases where the distribution is in partial liquidation or qualifies as sec. 302(a) or sec. 303 redemptions.

that the proper charge to capital under section 312(e) was an amount equal to the percentage of the par value and paid-in surplus of the common stock which was equal to the percentage of the outstanding common stock redeemed. In this case 17 percent of the common stock was redeemed and CLT charged the capital account in the amount of $13,058.58; 17 percent of the capital contributed with respect to the common stock.

Petitioners contend that the above procedure used by CLT was in accordance with the interpretation given to section 312(e) by this Court in *William D.P. Jarvis*, 43 B.T.A. 439 (1941), as affirmed by *Helvering v. Jarvis*, 123 F.2d 742 (4th Cir. 1941).

Respondent contends that the interpretation of section 312(e) and the formula for the application of that section contained in *Jarvis* are erroneous[14] and urges us to adopt his interpretation and formula which were enunciated in Rev. Rul. 70–531, 1970–2 C.B. 76. The heart of this controversy is the different meaning each party gives to the term "capital account."[15] Petitioner cites *Jarvis* for the proposition that under the facts of this case, the term "capital account" as used in section 312(e) includes only the par or stated value of the outstanding common stock plus the paid-in capital attributable thereto. Respondent argues that the term "capital account" as used in section 312(e) includes more than just the shareholders' contributed capital. Respondent contends that the account also contains the unrealized appreciation attributable to the assets owned by the distributor corporation, i.e., the excess of the fair market value of the corporate assets over the adjusted basis of those assets. The controversy under discussion is not new but instead is one

---

[14] Respondent does not address the question of whether the method used by CLT to compute the sec. 312(e) charge to capital in fact comports with the *Jarvis* rule (*William D. P. Jarvis*, 43 B.T.A. 439 (1941), affd. 123 F.2d 742 (4th Cir. 1941)). (See our discussion on this point in n. 29, p. 543, *infra*.)

[15] Another factor contributing to the difference in result is the respondent's inclusion of the preferred stock into the computation of the "proper charge" to capital account, i.e., respondent argues that because of the right of the preferred shareholders to participate in dividends after payment of the 4½-percent preferred dividends necessitates including the number of outstanding preferred shares into the denominator with the outstanding common shares to compute the percentage of stock redeemed which is then used to determine the proper charge to capital. We discuss this proposal at pp. 542, 543, *infra*.

which has a long and interesting history and which we deem appropriate to discuss briefly[16] and find vital to our decision herein.

What is now section 312(e) first appeared in the Revenue Act of 1924 as part of the last sentence of section 201(c) as follows:

In the case of amounts distributed in partial liquidation[17] * * * the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits * * * for the purpose of determining the taxability of subsequent distributions by the corporation.

Neither the definition of the term "capital account" nor the manner in which to make the "proper charge" thereto was contained in the Act of 1924. The legislative comments contained in the committee reports which accompanied this legislation were sparse. Both the House and Senate reports contained the same statement with respect to the provision which is now section 312(e):

No similar provision is contained in the existing law, although the provisions of the bill represent what is probably a correct construction of existing law and unquestionably what is in accord with business practice. [H.Rept. No. 179, 68th Cong., 1st Sess. 11–12 (1924); S. Rept. No. 398, 68th Cong., 1st Sess. 11–12 (1924).]

Upon examination of the "existing law" and the contemporary "business practice," the legislative comment proves to be less than enlightening.[18] No more enlightening is the example contained in the "Statement of the Changes Made in the Revenue Act of 1921 by H.R. 6715 and the Reasons Therefor," 68th Cong., 1st Sess. 3 (Comm. Print 1924), to illustrate the effect of this section, which merely demonstrates that payment of par value in redemption of stock "constitutes a capital transaction and does not affect the earnings and profits of the corporation on hand for subsequent distribution."

---

[16] For an exhaustive discussion of the history of sec. 312(e) and the current controversy as it existed at the date of publication, see Edelstein & Korbel, "The Impact of Redemption and Liquidation Distributions on Earnings and Profits: Tax Accounting Aberrations Under Section 312(e)," 20 Tax L. Rev. 479 (1965).

[17] As defined by sec. 201(g) of the Revenue Act of 1924, amounts paid in partial liquidation included distributions in redemption of part of the corporation's stock.

[18] See Edelstein & Korbel, *supra* at 482–488.

The meaning of the term "capital account" was first alluded to in the case of *John B. Stewart,* 29 B.T.A. 809, 814 (1934), where it was assumed in the discussion that "capital account" meant the par value of the stock. *August Horrmann,* 34 B.T.A. 1178 (1936), was the first case to deal directly with the application of section 312(e) and the definition of capital account. The Court therein recognized a distinction between the accounting definition of capital and the term "capital account" as used in the Code and defined the statutory term as meaning "only paid-in capital." In doing so the Court reasoned:

We think that a proportional part of the paid-in capital must be considered as standing behind each of the shares outstanding at any particular time, so that on redemption of any of them a certain part of the redemption is properly chargeable against capital account. * * * [34 B.T.A. at 1186.]

Next, in *William D.P. Jarvis,* 43 B.T.A. 439, 444 (1941), we determined that a redemption of one-tenth of the outstanding stock required a proportionate charge to the capital account (as defined in *Horrmann*), and held the remainder of the distribution was to be charged to earnings and profits. On appeal, the Fourth Circuit affirmed. *Helvering v. Jarvis,* 123 F.2d 742 (4th Cir. 1941). The Fourth Circuit in the course of its opinion noted an alternative argument made by the Commissioner that "the Board failed to take into account the *unrealized appreciation* of the corporation's assets. [Emphasis added.]" The court agreed with the Board and rejected this argument. *Helvering v. Jarvis, supra* at 746.

The Commissioner issued a nonacquiescence to the *Jarvis* decision at 1941–1 C.B. 16. A year later in 1942–2 C.B. 10, the Commissioner withdrew his nonacquiescence and substituted therefor an acquiescence.[19]

---

[19] G.C.M. 23460, 1942–2 C.B. 190, contained an explanation of the Treasury's acquiescence: The memorandum was in response to a requested opinion as to whether the *Jarvis* opinion was in conflict with the Board of Tax Appeals' opinion in *Woodward Investment Co.,* 46 B.T.A. 648 (1942). (In *Woodward* the question presented was the proper amount of earnings and profits distributed in the first distribution of a complete liquidation of a corporation for purposes of determining the dividends-paid credit (see sec. 27(f), Revenue Act of 1936). We determined therein that the proper amount of earnings and profits distributed was determined as follows:

$$\text{Amount of distribution} \times \frac{\text{amount of earnings and profits}}{\text{amount of earnings and profits plus capital account}}$$

After discussing its interpretations of those opinions the Treasury concluded that they were not inconsistent but "merely reflect necessary differences in the

From the time of its enactment, section 201(c), *infra*, renumbered section 115(c) in the Revenue Act of 1928, remained virtually unchanged.

In 1954 the Internal Revenue Code underwent review which resulted in substantial amendments thereto and included among the changes was a comprehensive revision of subchapter C, "Corporate Distributions and Adjustments." As part of the revision to subchapter C the bill introduced by the House of Representatives (H.R. 8300) contained a new provision, sec. 310(c), which, in pertinent part, stated:

(c) PARTIAL LIQUIDATIONS, CORPORATE SEPARATIONS, AND REDEMPTIONS.— * * * upon a redemption of stock * * * which is treated as a distribution in full or part payment for such stock under section 302(a), [a corporation's] earnings and profits shall be decreased by an amount which bears the same relation to the earnings and profits immediately prior to the transaction as the amount of money and the adjusted basis of the assets (plus the principal amount of securities, if any) distributed bears to the amount of money and the adjusted basis of the total assets immediately prior to such distribution. * * *

In rejecting this proposed new rule the Senate Finance Committee responded:

The House bill supplied an additional rule for the determination of the manner in which earnings and profits should be allocated when there was a * * * redemption. Your committee strikes this rule since it is believed that existing administrative practice, making these determinations as the facts of each case may indicate, has been successful in achieving correct results. [S. Rept. No. 1622, 83d Cong., 2d Sess. 47 (1954).]

Section 312(e) of the 1954 Code was enacted in substantially the same language used in section 115(c) of the 1939 Code and section 201(c) of the 1924 Act. None of the amendments to the Code subsequent to 1954 have directly affected section 312(e).[20]

---

application of a general principle to different types of situations" and thus acknowledged the withdrawal of the nonacquiescence in *Jarvis*.

[20] However, as part of the Revenue Act of 1962 (Pub. L. No. 87–834), Congress promulgated sec. 312(l)(3) which dealt with the effect on earnings and profits of a foreign investment company in cases of partial liquidation and redemptions. Said section provided that: "the part of such distribution which is properly chargeable to earnings and profits shall be an amount which is not in excess of the ratable share of the earnings and profits of the company * * * attributable to the stock so redeemed." Sec. 562(b) of the 1954 Code also takes a different approach in determining the dividend-paid credit. But, while the point can be argued both ways ad infinitum, neither of these provisions modifies or applies to sec. 312(e).

In 1970 the Treasury adopted a change in the administrative practice respecting section 312(e) in Rev. Rul. 70–531, *supra.* In that ruling the Service considered a situation in which all of the stock of a corporation owned by one of two 50-percent shareholders was redeemed. The amount of the redemption distribution was such that application of the *Jarvis* formula resulted in the shareholder receiving a distribution in excess of the combined amounts of the paid-in capital as well as the earnings and profits. In light of this situation, the Service reexamined the holdings of *Jarvis, Woodward,* and *F. & R. Lazarus & Co.*[21] (a 1942 Tax Court decision which essentially affirmed the definition of capital account contained in *Jarvis*), which considered the term "capital account" to include only paid-in capital, and concluded that they were erroneous. Accordingly, the Service withdrew the prior acquiescence and proposed a new formula which purportedly yielded a result which was in accord with economic realities and also with the statute (sec. 312(e)). The Service stated that because of the implausible result reached under the *Jarvis* definition of capital account, said account must include, in addition to paid-in capital, all other similar attributes (i.e., those treated like capital in the sense that when distributed they are not taxed as dividends but instead are applied against and reduce the basis of the distributee's stock) such as unrealized appreciation (appraisal or valuation) surplus. The formula contained in the revenue ruling to determine the part of a redemption distribution which is "properly chargeable to capital account" is as follows: portion of paid-in capital ratably attributable to share redeemed + [(amount of the distribution) − [(portion of paid-in capital ratably attributable to share redeemed) + (portion of earnings and profits which is ratably attributable to share redeemed)]].

In 1972, in the case of *Herbert Enoch,* 57 T.C. 781 (1972), nonacquiesced on this issue 1974–1 C.B. 1, the propriety of respondent's ruling was first considered. In that Court-reviewed decision the applicability of Rev. Rul. 70–531 became an issue when we found that certain actions, taken subsequent to a section 302(a) redemption distribution, constituted a constructive dividend to the shareholder and thus

---

[21] *F. & R. Lazarus & Co.,* 1 T.C. 292 (1942).

necessitated a determination of the corporation's earnings and profits. The respondent had determined that the earlier stock redemption constituted a constructive dividend to the petitioner therein and accordingly reduced earnings and profits in full, pursuant to section 312(a); he did not make an alternative argument that Rev. Rul. 70–531 applied should we find said redemption qualified under section 302(a). In our decision in *Enoch* we computed the reduction to earnings and profits under section 312(e) resulting from the redemption pursuant to the *Jarvis* formula. We made reference to respondent's ruling and by way of footnote indicated our appreciation of the fact that we took a different course than he had charted in his ruling.

On brief in the case now before the Court, respondent asks us to reconsider our decision in *Enoch* not to adopt the approach contained in Rev. Rul. 70–531 as to the definition of "capital account" and the proper charge thereto under section 312(e).

Rather than engaging in a lengthy and, we believe, fruitless discussion of the relative merits and criticisms of the respective formulas for the application of section 312(e) espoused in *Jarvis* and Rev. Rul. 70–531, we shall briefly examine those formulas and discuss our reasons for rejecting respondent's request for us to promulgate a change of position.

Respondent's brief in this case is essentially an amplification of the justification given in Rev. Rul. 70–531 for conclusions contained therein. Respondent begins by restating the illustration given in that ruling wherein the amount of the cash redemption distribution exceeds both the capital account (as defined in *Jarvis*) and the earnings and profits account. Respondent, in an obvious allusion to the previously described legislative history (see p. 534, *supra*) concludes that this result makes little accounting or business sense. However unrealistic the hypothetical posed by respondent, his point is well taken. In a more realistic setting, we can imagine a situation in which a corporation has on hand cash, a portion of which represents some unrealized (taxwise) appreciation of assets and distributes some or all of that cash in an amount in excess of the redeemed shareholder's pro rata share of capital and earnings and profits. Under section 312(e) as interpreted

by *Jarvis* the excess distribution will be charged to earnings and profits. This is the core of respondent's dissatisfaction with the *Jarvis* rule; a section 302(a) redemption which yields capital gains treatment to the redeemed shareholder and reduces more than a pro rata portion of earnings and profits for purposes of subsequent distributions to remaining shareholders. Nonetheless, respondent's legal arguments in favor of including unrealized appreciation in the capital account, an argument specifically rejected in the *Jarvis* decision (see p. 535, *supra*), are unpersuasive.[22]

In place of *Jarvis* the respondent would have us adopt the formula prescribed in Rev. Rul. 70–531, see p. 537, *supra.*

However, as has been pointed out elsewhere,[23] by means of simple algebra this formula breaks down into the following components: Proper charge to capital = amount distributed − [(shares redeemed ÷ total shares outstanding) × earnings and profits].

Consequently, under respondent's formula the redeemed shares' pro rata portion of earnings and profits is first determined and subtracted from the amount of the distribution and the remainder of the distribution is the "proper charge to capital account." We believe that this formula is contrary to the statutory language which requires computation of the charge to capital first *followed by* a charge of the balance of the distribution to earnings and profits. The result of adoption of respondent's formula would be to render meaningless the term "capital account" in the computation under section 312(e);[24] an effort which was made by the House

---

[22] *Bangor & Aroostook R. Co. v. Commissioner*, 193 F.2d 827 (1st Cir. 1951), affg. 16 T.C. 578 (1951), cert. denied 343 U.S. 934 (1952). See Edelstein, "Revenue Ruling 70–531: Section 312(e) Revisited," 26 Tax L. Rev. 855 (1971); Albrecht, " 'Dividends' and 'Earnings Or Profits,' " 7 Tax L. Rev. 157 (1952); cf. sec. 312(a)(3); *Commissioner v. Hirshon Trust*, 213 F.2d 523 (2d Cir. 1954), revg. on other grounds a Memorandum Opinion of this Court, cert. denied 348 U.S. 861 (1954); *Commissioner v. Godley's Estate*, 213 F.2d 529 (3d Cir. 1954), revg. 19 T.C. 1082 (1953), cert. denied 348 U.S. 822 (1954).

[23] See Reid, "To what extent will distributions in redemption of stock reduce earnings and profits?" 42 J. Taxation 29, 31 (1975).

[24] The effect of using respondent's formula is to allocate all presumably unrealized appreciation (calculated by arithmetic rather than appraisal or valuation) to capital account. As indicated in some of the writings on this subject referred to elsewhere herein, this allocation can produce some bizarre results on subsequent distributions by the corporation. Here, respondent's computation states that CLT had earnings and profits totaling $1,282,599 at the time of the common stock redemption. Under the

of Representatives in its legislative proposal of 1954 and which was rejected by the Senate and full committee.[25] To adopt the respondent's formula in light of the foregoing would be too presumptuous to be countenanced, and we cannot and will not take such action.

To be sure, under some circumstances the formula pronounced in *Jarvis* presents some problems; however, the respondent acquiesced in *Jarvis* and by revenue ruling applied this rule for over 28 years. While there is generally no legal impediment to respondent's changing his position in an attempt to correct a mistake of law (see *Dixon v. United States,* 381 U.S. 68 (1965)), retroactively (see sec. 7805), we do not find that principle applicable here. The repeated congressional reenactment of section 312(e) without change, in the light of the Court's interpretation and application thereof in *Jarvis* and respondent's acquiescence therein, strongly suggests that Congress has accepted the *Jarvis* approach as the correct interpretation of section 312(e). See *Helvering v. R.J. Reynolds Tobacco Co., 306 U.S. 110 (1939).*

In our examination of the writings on this subject we note that the authorities have criticized both the *Jarvis* approach and the respondent's approach in Rev. Rul. 70–531;[26] with much of the criticism we are in agreement. However, we have found no suggested interpretation of the section consistent with the wording thereof which solves all of the possible

---

formula of Rev. Rul. 70–531, 1970–2 C.B. 76, only $185,977 of the $510,000 paid for the redeemed stock would be charged against earnings and profits, leaving a balance of $324,023 as "properly chargeable to capital account." However, CLT had only $247,814 in its capital account at that time, consisting of par value and paid-in capital attributable to all three classes of stock outstanding. If unrealized appreciation can be added to corporate accounts at all, it would seem more equitable to allocate the unrealized appreciation ratably between capital account and the earnings and profits account, although this, too, can produce seemingly unrealistic results at times.

[25] We believe it noteworthy and indeed find it somewhat distressing that respondent, while devoting a substantial portion of his brief to an examination and interpretation of the legislative history surrounding sec. 312(e) both before and after 1954, makes no reference whatsoever to the congressional action taken in 1954 described above.

[26] See, for example, *Baker v. United States,* 460 F.2d 827, 835 (8th Cir. 1972) (Gibson, J., concurring); Edelstein & Korbel, *supra;* McCoy, "Revenue Ruling 70–531; Another View," 26 Tax L. Rev. 864 (1971); Jacoby, "Earnings and Profits; A Not So Theoretical Concept—Some Winds of Change," 29 N.Y.U. Inst. on Fed. Tax. 649, 655 (1971); McDaniel, "Earnings and Profits: More Than a Cold Accounting Concept: Additions To and Subtractions From," 32 N.Y.U. Inst. on Fed. Tax. 445, 483 (1974).

problems which may arise upon its application.[27] We believe that the problem encountered upon application of the *Jarvis* rule to the statute, as it currently exists, is a result of the timing of redemption distributions (i.e., a distribution before realization of gain from unrealized appreciation) and the lack of correlation between the tax effect on corporations and their shareholders as a result of corporate redemption distributions. (Under section 302(a) a shareholder's gain is taxed as capital gain without concern for the source of the distribution.)

The *Jarvis* rule is the result of an interpretation of congressional legislation which interpretation was subsequently explicitly adopted by Congress in 1954. Any change in said rule must now come from Congress.

(b) *CLT preferred stock redemption.*—During its taxable year ended March 31, 1970, CLT had current earnings and profits as contemplated by section 316(a)(2) of $199,578 before taking into account $49,298 of dividend distributions made to its common and preferred shareholders during the year and the preferred stock redemption described below. Immediately prior to the concerned redemption CLT had outstanding the following shares of stock: 2,075 shares of $1 par value class A common; 6,225 shares of $1 par value class B common; and 1,710 shares of $100 par value preferred stock. This stock was that which remained outstanding after the fiscal 1969 common stock redemption.

On March 16, 1970, CLT distributed $411,733 to one of its shareholders in redemption of all 1,710 shares of its outstanding preferred stock. At the time of the redemption there were no accrued unpaid dividends with respect to said stock.

For tax purposes CLT treated this redemption as it had the previous year's common stock redemption: It charged $171,000 to its capital account under section 312(e) as representing the entire paid-in capital with respect to its preferred stock, all of which was redeemed. The remainder of the distribution, $240,733, was charged to earnings and profits pursuant to section 312(e).

---

[27] One solution which has been offered as yielding an equitable result under all possible circumstances is put forth in Edelstein & Korbel, *supra* at 520. However, this approach is impossible under the current statute (see sec. 312(f)).

For the reasons stated above in our discussion of the effect of the redemption of the common stock on CLT's earnings and profits, we conclude that CLT's treatment of the amount paid to redeem all of its preferred stock outstanding was in accord with the formula prescribed in the *Jarvis* case and was correct.

In addition to arguing the propriety of applying the *Jarvis* formula rather than the formula prescribed in Rev. Rul. 70–531 to the two redemptions, respondent also argues that CLT's application of the *Jarvis* formula was erroneous in both instances. Respondent contends that since the preferred stockholders participate equally in dividend distributions, after receiving their stated preference, the pro rata charge to capital account under section 312(e) resulting from a redemption of either common or preferred shares should be computed by including all three classes of CLT's stock in the computation as outstanding shares.[28] Respondent's proposal would mean that CLT should account for the fiscal 1969 common stock redemption as a repurchase of 14.5 percent of the outstanding stock rather than 17 percent of the outstanding common, and the fiscal 1970 preferred redemption as a repurchase of 17 percent of the outstanding stock rather than 100 percent of the preferred.

We reject respondent's proposed treatment. While a strict reading of our holding in *Jarvis* as affirmed by the Fourth Circuit allows sufficient latitude to adopt respondent's position in appropriate circumstances, under the present facts we believe such finding would be inappropriate and illogical. Application of section 312(e) requires a determination of the proper charge to capital account. As we said in *August Horrmann, supra,* a case upon which we relied in *Jarvis:*

> We think that a proportional part of the paid-in capital must be considered as standing behind each of the shares outstanding at any particular time, so that on redemption of any of them a certain part of the redemption is properly chargeable against capital account. * * * [34 B.T.A. at 1186.]

---

[28] As noted in n. 24, respondent's computation of the effect of the 1969 common stock redemption would have left a deficit in CLT's capital account unless an unspecified amount of unrealized appreciation was somehow added to capital account.

Consequently, if the paid-in capital of a corporation is clearly attributable to specifically distinguishable classes of stock, the proper charge to "capital account" should be made to the capital account which represents the class of stock being redeemed.[29] By making this determination herein we do not mean to state a hard and fast rule in this regard for under different circumstances it may be appropriate to make the computation otherwise; for example, if through various means the corporate structure has been reshaped in such a manner as to make it impossible to account for the capital attributable to specific classes of stock. But for purposes of this case we hold that under section 312(e) the "proper charge" to be made is to the respective capital accounts of the various classes of stock being redeemed by including in the computation only the outstanding shares of the respective classes being redeemed.

On this issue we conclude that CLT's computation of the amounts chargeable against its earnings and profits as a result of the redemption of both its common stock in 1969 and its preferred stock in 1970 was correct.

### Issue 2

The next issue for our consideration involves a rather controversial topic, the effect on corporate earnings and profits resulting from the grant and exercise of employee stock options.

Sometime prior to April 1, 1970, the date Associates acquired the subsidiary corporations herein, both Old TAACO and CLT had issued certain "qualified stock options" (as defined in section 422) to employees. Old TAACO had granted options to purchase its common stock to some of its own employees and to one employee of its wholly owned subsidiary, SRC. CLT had granted options to purchase its common stock to some of its employees.

---

[29] In this regard CLT's treatment of the common stock redemption in fiscal 1969 was theoretically erroneous. CLT accounted for the redemption of 17 percent of the outstanding class A common and 17 percent of the outstanding class B common as a repurchase of 17 percent of the common stock outstanding. This treatment is not in accord with the proper method as described in the text. However, the same percentages of class A and class B shares were redeemed and thus accounting for the redemptions of each class individually yields the same result.

As part of the April 1, 1970, acquisitions by Associates of Old TAACO and CLT, the above-described stock options were assumed by Associates within the meaning of section 425(a); thereafter, such options pertained to shares of Associates' common stock.

After April 1, 1970, all of the former employees of Old TAACO who had been granted options by that corporation became employees of New TAACO; three of these individuals, who had been senior officers of Old TAACO, became officers of both Associates and New TAACO (hereinafter referred to as dual employees). The SRC employee who had received an option to purchase Old TAACO shares remained solely in the employ of SRC after April 1, 1970.

The employees of CLT who had received the stock options from that corporation remained CLT employees after the April 1, 1970, acquisition. However, after Associates' acquisition one of said employees who had been a senior officer of CLT also became an officer of Associates; he will also be referred to hereafter as a dual employee.

Subsequent to the April 1, 1970, acquisition, Associates granted additional qualified stock options to purchase its common stock to the dual employees as well as to certain employees of New TAACO, CLT, SRC, and S. & Y.

During the taxable years ended March 31, 1971, and 1972, the dual employees and the employees of New TAACO, CLT, SRC, and S. & Y. exercised some of the qualified options. The employer of the optionees, the fair market value of Associates' stock at date of exercise, and the price paid to exercise said options are stipulated as follows:

| Employer of optionees exercising options | FMV at date of exercise | Option price paid |
|---|---|---|
| TYE Mar. 31, 1971 | | |
| Dual employees | $15,000 | $6,874 |
| New TAACO | 110,250 | 50,524 |
| CLT | 238,500 | 109,472 |
| SRC | 7,500 | 3,437 |
| | 371,250 | 170,307 |
| TYE Mar. 31, 1972 | | |
| Dual employees | $112,088 | $54,864 |
| New TAACO | 325,457 | 92,247 |

| | | |
|---|---|---|
| CLT | $297,017 | $68,751 |
| SRC | 19,881 | 4,770 |
| S. & Y. | 12,450 | 7,998 |
| | 766,893 | 228,630 |

All of the options exercised by the dual employees during the fiscal year ended March 31, 1971, had been granted initially by Old TAACO and assumed by Associates. Some of the options exercised by said dual employees during the fiscal year ended March 31, 1972, likewise had been granted by Old TAACO and later assumed by Associates; the remainder had been granted by New TAACO (as stipulated) after April 1, 1970.

During the taxable years ended March 31, 1971, and March 31, 1972, all of the optionees who exercised the options received their compensation from either New TAACO or CLT. New TAACO paid the compensation of the following employees: (1) Dual employees of New TAACO and Associates; (2) New TAACO officers; and (3) SRC officers.[30] CLT paid the compensation of the CLT officers and the dual employee of CLT and Associates. Both New TAACO and CLT claimed the amounts of compensation paid to the above-described individuals as deductions on the respective consolidated tax returns.

The issue now under discussion is substantially circumscribed as a result of a concession by respondent. Respondent concedes that upon the exercise of a qualified employee stock option an amount equal to the spread between the fair market value of stock at the date of exercise and the option price paid therefor is a proper reduction to earnings and profits. Respondent concedes this issue only for purposes of this case and only because of the position taken by the Seventh Circuit Court of Appeals, to which an appeal of this case would lie, in *Luckman v. Commissioner*, 418 F.2d 381 (7th Cir. 1969), revg. 50 T.C. 619 (1968), and because of the fact that this Court, under *Jack E. Golsen*, 54 T.C. 742 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), would follow the position of the Seventh Circuit in this

---

[30] New TAACO also paid the compensation of the optionees who were employed by S. & Y. during both of the indicated years. However, this compensation expense was reimbursed by S. & Y. to New TAACO, and S. & Y. claimed the deductions therefor on Associates' consolidated returns for both years.

case.[31] So we do not have before us the issue of whether the exercise of the options reduces earnings and profits.

However, a controversy remains because respondent asserts that the corporation which is entitled to reduce its earnings and profits in a case such as this is the corporation that *employs* the optionee exercising the option rather than the corporation issuing the stock. Petitioners disagree; they argue that the spread is deductible from Associates' earnings and profits for two reasons: (1) The Seventh Circuit in *Luckman v. Commissioner, supra,* held that the spread reduced earnings and profits because it constituted a "true economic expense" to the issuing corporation; and (2) the purpose of the statutory provisions contained in sections 421–425 is to treat the issuing corporation as the corporation which "employs" the optionee. We agree with respondent.

The parties have stipulated that all of the stock options with which we are concerned were "qualified stock options" as defined under section 422 and that the options which were issued prior to April 1, 1970, were assumed by Associates in accordance with section 425(a).

Section 421(a)[32] states the general rules prescribing the tax effects which result from the transfer of stock to an individual pursuant to his exercise of a qualified stock option under section 422. Generally speaking, no income results to the optionee as a consequence of his exercise of the option, no deduction under section 162 results to the corporation with

---

[31] This Court maintained the position it took on this issue in *Sid Luckman,* 50 T.C. 619 (1968), i.e., that the spread did not reduce earnings and profits, in *Harold S. Divine,* 59 T.C. 152 (1972), but was again reversed by a divided opinion of the Second Circuit, 500 F.2d 1041 (2d Cir. 1974).

[32] SEC. 421. GENERAL RULES.

(a) EFFECT OF QUALIFYING TRANSFER.—If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section 422(a), 423(a), or 424(a) are met—

    (1) except as provided in section 422(c)(1), no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;

    (2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which section 425(a) applies, with respect to the share so transferred; and

    (3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.

respect to the stock transferred, and no amount other than the option price paid by the optionee is considered as received by the corporation for the share so transferred. However, the statute contains no reference to the effect such a transaction is to have on corporate earnings and profits. When faced with the problem posed by this statutory omission, we determined that a stock option issued in accordance with these special tax provisions was an incentive device and not a form of compensation and held that the exercise of such an option did not generate a reduction to earnings and profits of the corporation. See *Sid Luckman,* 50 T.C. 619, 628 (1968); *Harold S. Divine,* 59 T.C. 152 (1972), revd. 500 F.2d 1041 (2d Cir. 1974).

On appeal of the *Luckman* case the Seventh Circuit reversed our decision. In reaching its decision the Seventh Circuit examined employee stock options in general and concluded that the amount of the spread constituted · an economic gain to the employee, received by him as compensation for services, and represented an economic expense to the issuer-employer. The court stated that had the corporation compensated the employee with cash equal to the amount of the spread and then the employee used this cash together with his own funds (equal to the option price) to purchase the stock, "there could be no question that the corporation had incurred a true economic expense which reduced earnings and profits." After an examination of sections 421–425 and their legislative histories, the court determined that Congress did not intend the statutory options to have a different character from other nonstatutory stock options and consequently held that the earnings and profits are reduced by the amount of the corporate expense, the amount of the spread.

Since the *Luckman* case is conceded as controlling, insofar as it requires a reduction from corporate earnings and profits, we deem it appropriate to apply its rationale to the issue herein in determining which corporation may reduce its earnings and profits, the grantor corporation or the employer corporation.

Under the *Luckman* rationale the spread in the exercise of a stock option pursuant to sections 421–425 constitutes nontaxable compensation to the optionee-employee and non-

deductible business expense to the corporation. Section 421(a)(2) provides that:

SEC. 421. GENERAL RULES.

* * *

(2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which section 425(a) applies, with respect to the share so transferred; * * *

The language used in section 421(a)(2) which precludes a deduction "under section 162" clearly demonstrates congressional recognition of the fact that statutory authority for a deduction upon the transfer of stock springs from section 162. Pursuant to well-established case law interpreting section 162 (and its predecessor), under almost all circumstances compensation paid to an employee is deductible only by the actual employer. See *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233 (Ct. Cl. 1969); *Columbian Rope Co.*, 42 T.C. 800 (1964); cf. secs. 1.162–7 and 1.162–9, Income Tax Regs. Nor is a different rule applicable merely because a subsidiary-parent relationship exists between the employer and payor corporations. *Missouri-Kansas Pipe Line Co. v. Commissioner*, 148 F.2d 460 (3d Cir. 1945); *Esmond Mills v. Commissioner*, 132 F.2d 753 (1st Cir. 1943); *South American Gold & Platinum Co.*, 8 T.C. 1297 (1947), affd. per curiam 168 F.2d 71 (2d Cir. 1948); *Eskimo Pie Corp.*, 4 T.C. 669 (1945), affd. per curiam 153 F.2d 301 (2d Cir. 1946). Cf. sec. 404(a)(3)(B).

We believe it follows that were it not for section 421(a)(2) the employer corporation would be entitled to a deduction for the "spread" between the option price and the fair market value of the stock at the time the option is exercised, even though the stock is stock of the employer corporation's parent. This result is reached by the following analogy of what is deemed to happen.

(a) The parent is deemed to have transferred to the subsidiary-employer an amount of cash equal to the spread between the option price and fair market value of the stock at the date of exercise. This cash represents a contribution of capital by the parent and permits an increase in its basis in the subsidiary's stock.

(b) The subsidiary is deemed to purchase the parent's stock needed to distribute to the employees with the cash received

from the parent plus its own funds in an amount equal to the option price. As a result of the transaction the parent has realized no income, sec. 1032, and the subsidiary has a basis in the parent's stock equal to its fair market value (the purchase price).

(c) The subsidiary is deemed to transfer the parent stock to its employees in return for services plus the option price. Were it not for section 421(a)(1) the employees would include in their income the spread, see sec. 83, and the subsidiary would have a deduction under section 162 in the same amount.[33] See sec. 1.421-6, Income Tax Regs., "Options to which section 421 does not apply," and section 83 of the Code, enacted in 1969, and the proposed regulations thereunder. In light of the Seventh Circuit's rationale in *Luckman* that sections 421-425 did not alter the underlying character of options as compensatory devices, we believe the above-mentioned Code section, which applies to transfers of property in connection with performance of services, and regulations, which apply to nonstatutory stock options, provide a helpful analogy in reaching a conclusion on this issue.

Section 1.421-6(f) of the regulations is not too helpful. It merely provides in part that if the *employer* grants an option he is considered to have paid compensation to the employee at the same time and in the same amount as the employee is considered to have realized such compensation. There is no reference in this subparagraph titled "Deductions" which prescribes a different treatment in the case of a corporation other than the employer granting said option. However, section 83[34] of the Code and the proposed regulations

---

[33] An alternative theory, possibly more in line with the analogies of the transaction by the Seventh Circuit in *Luckman v. Commissioner*, 418 F.2d 381 (7th Cir. 1969), but supporting the same conclusion, would be that the employer-subsidiary corporation paid the cash it received from the parent to the employee as compensation, then the employee used that cash and his own cash in the amount of the option price to buy the stock.

[34] SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORM-ANCE OF SERVICES. [Effective with respect to taxable years ending after June 30, 1969.]

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property * * *, over

(2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services * * *

thereunder deal specifically with the circumstances in which a parent transfers property to an employee of its subsidiary as compensation for services of such employee. It provides in general that the employee who receives the property in connection with the performance of services shall include in gross income the excess of the fair market value of such property over the amount paid therefor and the *employer* is allowed the same amount as a deduction under section 162. Sec. 83(h). While section 83 deals explicitly with the transfer of stock, respondent argues, and we agree, that the same legal principles are applicable in the case of a grant and subsequent exercise of a stock option.

While the *Luckman* case involved only one corporation which was both the employer and the issuer of the stock, we believe the rationale of the opinion of the Seventh Circuit in that case supports our thinking that the corporation that would be entitled to a deduction for the amount of the spread on the exercise of a stock option were it not for section 421(a), the employer corporation, is the corporation which may reduce earnings and profits in respect of such expense. Cf. sec. 1.312–6(a), Income Tax Regs.

Petitioners disagree on several grounds. They first cite *R.M. Weyerhaeuser*, 33 B.T.A. 594 (1935), for the proposition that the cases which denied an income deduction to one taxpayer for payment of expenses of another have no necessary relationship to whether the expenses paid are deductible for earnings and profits purposes. Perhaps there is no "necessary" relationship but, as noted by the Seventh Circuit in *Luckman*, "the crucial issue is whether a given transaction has a real effect upon the portion of a corporate net worth which is not representative of contributed capital and which results from its conduct of business." The granting and exercise of these stock options were not related to the conduct of Associates' business, but to the business of the subsidiaries. So we find no reason, under the reasoning of either this Court or the Seventh Circuit in *Luckman*, why the exercise of the stock options by employees of the subsidiaries should affect the earnings and profits of the parent. If the stock options are

---

\* \* \*

(e) APPLICABILITY OF SECTION.—This section shall not apply to—
　　(1) a transaction to which section 421 applies, \* \* \*

compensatory in character, the exercise thereof would affect the earnings and profits of the employer corporation. The exercise thereof with respect to the parent's stock triggers a capital transaction so far as the parent is concerned. The parent has incurred no true economic expense; it has simply invested additional funds in the form of its stock in the business of its wholly owned subsidiary.

Petitioners also argue that "it is the clear purpose of the cited Code provisions [secs. 422(b) and 421(a)] to treat Associates in all respects as if it were the 'employer' corporation." Relying on section 1.422–1(b)(2), Income Tax Regs., relative to the disqualifying disposition of option stock within 3 years after acquisition, petitioners contend that where the option is assumed upon a reorganization under section 425(a), or where it is issued by the parent of the actual employer as permitted by section 422(b), the deduction upon a disqualifying disposition is allowed not to the employer, but to the acquiring and/or parent corporation assuming or issuing the option; thus, it is the issuer of the stock and not the common law employer which is the party making the expenditure.

Petitioners do not elucidate on how they arrive at this conclusion. Perhaps it is because section 1.422–1(b)(2) of the regulations, in stating who is entitled to a deduction where the optionee disposes of the stock in less than 3 years at a loss, uses the language that the amount "deductible from the income of his employer corporation, its parent or subsidiary corporation or a corporation issuing or assuming an option in a transaction to which section 425(a) applies" is the amount includable in the income of the optionee. It is not clear why the regulation refers to all of those corporations when section 422(c)(4) of the Code, on which it is based, uses only the words "and the amount which is deductible from the income of his *employer* corporation" (emphasis supplied), but we attach no significance to the superfluity of words in this context. See also sec. 421(b).

The legislative history of section 218 of the Revenue Act of 1950, which added new section 130A to the Code, the precursor of section 421(a) of the present Code, indicates that Congress was attempting to create a means for employees to receive an incentive "stake in the business" without realizing

the countervailing effect of the impact of income tax at the time of receipt of the stock. See S. Rept. No. 2375, 81st Cong., 2d Sess. 59–60 (1950). To provide more flexibility, Congress allowed the incentive to consist of stock of a member of an affiliated group and used the language "the employer corporation or its parent or subsidiary corporation" in defining a qualified stock option in section 422(b) for that purpose. Presumably the same language was used in section 421(a)(2), denying a deduction for the spread, to insure that no corporation in the group could claim a deduction for the spread. We do not believe any implication can be drawn from this that Congress intended, absent section 421(a)(2), that any corporation other than the actual employer would be entitled to a deduction for the spread. Nor can we draw any implication from the language used in sections 421–425 that the issuing or assuming corporation was to be treated as the "employer" corporation for purposes of the stock option provisions.

We conclude that the reduction in earnings and profits allowed by the Seventh Circuit in *Luckman* as a result of the exercise of the stock options must be in the earnings and profits of the corporation that employed the individuals who exercised the options, rather than in the earnings and profits of Associates. However, there still remains the question of which corporation's earnings and profits were reduced by the exercise of options by the dual employees, those employed by two of the corporations.

It is stipulated that three optionee-employees of New TAACO, while retaining that employee status, became officers of Associates as well, after April 1, 1970.[35] Respondent addresses this question on brief and contends that the corporation for which such dual employees rendered their services more directly is entitled to the reduction in earnings and profits, or alternatively, that each employer be permitted an aliquot reduction of earnings and profits based upon the amount of working time each dual employee spent working for each corporation.

---

[35] According to the stipulation of facts the dual employees of CLT and Associates did not exercise any options during the taxable years here involved.

We find that respondent's contentions are in accord with the legal principles enunciated in *Young & Rubicam, Inc. v. United States* and *Columbian Rope Co., supra,* which, although dealing with income tax deductions, are, by analogy, applicable to the earnings and profits issue herein. And under the facts of this case, we need not decide which of respondent's tests should apply. The only fact presented to us which may relate to the question of to whom the dual employees more directly rendered their services or the amount of working time devoted by them to each employer was that the sole monetary compensation received by said employees during the years the options were exercised was paid by New TAACO, CLT, and S. & Y., and not by Associates.[36] We believe this fact alone is probably sufficient under the principles of *Young & Rubicam, Inc. v. United States,* and *Columbian Rope Co., supra,* to preclude any reduction of earnings and profits by Associates under either theory proposed by respondent, but even if not, petitioners have failed to introduce facts which would prove otherwise and as a consequence cannot prevail. *Welch v. Helvering,* 290 U.S. 111 (1933).

We conclude that the corporation which paid the dual employees' compensation is entitled to the appropriate reduction in its earnings and profits.

### Issue 3

The final issue for decision is one of first impression in this Court,[37] to wit: What tax treatment is to be accorded ordinary cash distributions received by shareholders when the distributing corporation makes both section 301(c) cash distributions and section 302(a) redemption distributions during a year in which said corporation began with no accumulated earnings and profits and the amount of current earnings and profits is insufficient to cover the appropriate charges thereto from both categories of distributions.

---

[36] In his brief, respondent has separately discussed the effect of New TAACO's and CLT's payments of other member corporations' employee compensation on the corporations' earnings and profits. Since respondent concludes that no significant net effect results therefrom, and since petitioners on brief indicate their agreement, we will not discuss the situation and direct the parties to exclude its consideration from the Rule 155 computation.

[37] This precise issue, however, has been decided by the Eighth Circuit Court of Appeals in *Baker v. United States, supra.*

On March 31, 1971, Associates repurchased 4,800 of the then-outstanding 118,040 shares of its stock for a price of $720,000. The parties have stipulated that the redemption qualified under section 302(a) for sale or exchange treatment to the redeemed shareholder and that the amount of the "capital account" as defined under section 312(e) immediately prior to the redemption was $4,075,344.[38]

We determined in issue 1, *supra*, that the proper charge to a corporation's capital account under section 312(e) in the case of a section 302(a) redemption is to be computed pursuant to the so-called *Jarvis* formula. The application of that formula to the facts of this issue results in a charge of $167,089.10 to Associates' capital account and a charge of $552,910.90 to earnings and profits to the extent thereof.[39] As a consequence of our resolution of the previous issues and of the parties' stipulation, the amount of current earnings and profits of Associates as defined in section 316(a)(2) in the fiscal year ended March 31, 1971, before consideration of this issue, was less than the sum of the charge to earnings and profits resulting from the redemption plus the amount of cash distributions made during the year. Therefore, in order to characterize the tax treatment to be accorded the cash distributions received by the shareholders, we must determine how and when either category of distributions affected Associates' current earnings and profits. To the extent, if any, that the ordinary distributions received by petitioners are determined to have come from current earnings and profits, they are taxable to petitioners as ordinary income,[40] see secs. 301(a), 301(c)(1), and 61(a)(7); otherwise, such distributions are treated as a reduction of basis to the extent thereof, sec. 301(c)(2), and any excess received is accorded sale or exchange treatment, sec. 301(c)(3)(A).[41]

---

[38] The amount of the capital account of CLT was the subject of the controversy in issue 1, *supra*. On brief, respondent claims to have inadvertently stipulated to the amount of Associates' capital account for purposes of this issue, hence the absence of controversy herein.

[39] On brief respondent states that due to his stipulation of the amount of Associates' capital account prior to the stock redemption, he does not argue the applicability of Rev. Rul. 70–531 to the facts of this issue.

[40] Except for the $100 exclusion allowed to each of the petitioners. Sec. 116.

[41] Of course, under the circumstances of this case, it is to petitioner's benefit to have the distributions in redemption of the corporate stock first charged against earnings and profits. Such distributions would be received by the stockholders as in

Subchapter C of subtitle A, I.R.C. 1954, prescribes the tax treatment resulting from corporate distributions and adjustments. Our discussion will begin with a brief examination of part I of subchapter C titled "Distributions by Corporations," in order that the ensuing discussion can be fully appreciated and because we feel that the congressional intent motivating the underlying tax scheme contained in this closely integrated subchapter is manifest, and we deem such overall intent to be pertinent to the issue at bar.

Part I contains three subparts: A—"Effects on recipients," B—"Effects on corporation," and C—"Definitions; constructive ownership of stock."

In subpart A our focus is upon pertinent parts of two sections, section 301[42] and section 302.[43]

Section 301(a) states that except as otherwise provided, the tax treatment accorded a shareholder who receives a corporate distribution shall be that described in section 301(c). Section 301(c)(1) requires that the portion of a distribution

---

exchange for their stock, sec. 302(a), thus in all likelihood producing a capital gain, while at the same time reducing the earnings and profits that can be attributed to the ordinary dividend distributions which are taxed as ordinary income.

[42] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).
* * *

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

(2) AMOUNT APPLIED AGAINST BASIS.—That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

(3) AMOUNT IN EXCESS OF BASIS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property.

[43] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
* * *

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

which is a dividend shall be included in gross income. Section 316[44] is contained in subpart C and it defines a dividend for all purposes of the income tax. As a general proposition section 316 defines a dividend as a distribution out of the distributing corporation's earnings and profits and the statute contains a presumption that every distribution is made out of earnings and profits, except as otherwise provided in subtitle A.

Section 302 is one of the exceptions contemplated by section 301. Section 302(a) states in essence that corporate distributions made in redemption of stock shall be treated as a sale or exchange of such stock by the redeemed shareholder. However, the applicability of this exception is severely limited by its terms to a transaction which qualifies under one or more of the paragraphs of subsection (b); if the redemption distribution does not so qualify, then subsection (d) makes the aforedescribed general rule of section 301 applicable thereto.

Our attention to subpart B, which is concerned with the effects of distributions on corporations, is essentially directed to section 312 which describes the effect of distributions on the earnings and profits account. Section 312(a)[45] states as a general rule that "on the distribution of property * * * earnings and profits * * * shall be decreased" by certain

---

[44] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

    (1) out of its earnings and profits accumulated after February 28, 1913, or

    (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

[45] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(a) GENERAL RULE.—Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—

    (1) the amount of money,

    (2) the principal amount of the obligations of such corporation, and

    (3) the adjusted basis of the other property so distributed.

amounts, except as otherwise provided in this section. One of the exceptions contemplated is subsection (e), discussed in detail in issue 1, which limits the reduction of earnings and profits under subsection (a) to that amount which is not a proper charge to capital.

Fundamentally the controversy in this case centers upon the proper interpretations to be given sections 312(a) and 316(a)(2), individually, and also the interrelationship of these two sections.

Section 316(a)(2) includes in the definition of a dividend, distributions out of current earnings and profits. In determining whether distributions are made out of current earnings and profits the statute requires a computation thereof as of the close of the taxable year "without diminution by reason of any distributions made during the taxable year" and provides that the amount of earnings and profits at the time of a distribution is to be disregarded.

Respondent focuses upon the last-quoted language and interprets the statute as requiring the preservation of all current earnings of the year as a source available for ordinary distributions made during the year so as to categorize them as dividends taxable to recipients pursuant to section 301(c)(1). Respondent cites Rev. Rul. 74–339, 1974–2 C.B. 103, as governing this very issue. That ruling, apparently promulgated as a result of the Eighth Circuit's decision in *Baker v. United States*, 460 F.2d 827 (1972), and subsequent to the year at bar, holds under facts identical to those herein where both ordinary and redemptive distributions are made and the distributing corporation begins the tax year without accumulated earnings and profits and the current earnings are insufficient to cover the charge thereto from the distributions, that the ordinary cash distributions are deemed to be made from the current earnings and profits to the extent thereof as computed under section 316(a)(2) before taking into account the section 302(a) redemption distribution.

Petitioners, to the contrary, contend that application of the relevant Code sections, 312(a), 312(e), and 316(a)(2), requires that a section 302(a) redemption distribution be given a prior charge to Associates' earnings and profits. They argue that this conclusion follows from the language of section 316(a)(2) which requires an end-of-the-year computation of current

earnings and profits and precludes a reduction of current earnings and profits as a result of ordinary cash distributions made during the year. They state that since section 316 has no application to a section 302(a) redemption distribution the language of subsection (a)(2) cannot prevent a reduction of current earnings and profits, accumulated as of the date of redemption, by such a distribution. The underlying premise of petitioners' contention is that the phrase "any distributions" contained in section 316(a)(2) does not encompass redemptive distributions qualifying under section 302(a). Petitioners contend that only section 312 governs the *time* and the amount of the charge to earnings and profits resulting from a section 302(a) redemption: Subsection (e) provides a reduction of the corporation's capital account in the amount properly chargeable thereto and subsection (a) provides a reduction of earnings and profits by the remaining amount of the distribution *at the time* the distribution is made, i.e., "on the distribution."

After careful consideration of the relevant Code sections and a study of their legislative histories and of the parties' extensive arguments, we resolve this question in favor of respondent and hold that the ordinary cash distributions made by Associates during its taxable year ended March 31, 1971, were out of current earnings and profits to the extent thereof.

Petitioners make essentially three arguments to support their contention that the phrase "any distributions" in section 316(a)(2) does not encompass section 302(a) distributions and that therefore the redemptive distributions made by Associates at issue herein served to reduce the current earnings and profits prior to the end of the taxable year ended March 31, 1971, and prior to the section 316(a)(2) computation of current earnings available for dividend characterization purposes. We shall consider petitioners' arguments in the order presented on brief: (1) Judicial history of section 316; (2) legislative history of section 316(a)(2); and (3) interrelationship of sections 316(a)(2) and 312(a).

(1) Judicial history of section 316.—Prior to the Revenue Act of 1936 the definition of a dividend was contained in section 201; subsection (a) represented what is now section

316(a)(1), and subsection (b) contained the source rule which is now a part of the last full paragraph of section 316.[46] Subsection (c) of section 201 was in part the precursor of section 302(a) and provided for sale or exchange treatment to the distributee of a redemption distribution.[47] Section 316(a)(2) had no counterpart in the tax law until the 1936 Act.

In 1928 the Supreme Court had occasion to review the statutory definition of a dividend under section 201(a) of the Revenue Act of 1918 (now sec. 316(a)(1)) in *Hellmich v. Hellman,* 276 U.S. 233 (1928). In that case the Court held that notwithstanding the broad language of the section defining a dividend in terms of "any distribution," a liquidating distribution was not within the purview of that statute. Instead, the Court held that section 201(c) applied and such distributions were taxed as payments in exchange for stock. It is unquestionable that the Supreme Court's conclusion, that a redemption distribution is not within the definition of a dividend, remains good law, see *Baker v. United States, supra,* and cases cited therein; and respondent does not contend otherwise.

In the Revenue Act of 1936, Congress enlarged the definition of a dividend by promulgating new section 115(a)(2) (the current sec. 316(a)(2)), which specified the aforedescribed yearend computation of current earnings and profits, and also included the parenthetical prescription against reducing current earnings and profits by reason of *"any distributions"* made during the year.

Petitioners argue that the Supreme Court's holding in *Hellmich v. Hellman, supra,* interpreting the phrase "any distributions" used in section 316(a)(1) so as to exclude section 302(a) redemption distributions, requires us to hold that the same phrase as used in subsection (a)(2) likewise does not contemplate such distributions. To do otherwise, they contend, would be in direct contradiction to the most basic

---

[46] For an extended discussion of the legislative history of sec. 316 see Rudick, " 'Dividends' and 'Earnings and Profits' Under the Income Tax Law: Corporate Non-Liquidating Distributions," 89 U. Pa. L. Rev. 865 (1941); Edelstein & Korbel, "The Impact of Redemption and Liquidation Distributions on. Earnings and Profits: Tax Accounting Aberrations under Section 312(e)," 20 Tax L. Rev. 479 (1965).

[47] Sec. 201(c) explicitly applied to liquidating distributions; sec. 201(g) defined partial liquidations as including redemptions.

principles of statutory construction. Petitioners cite the quoted language below from *Noteman v. Welch,* 108 F.2d 206 (1st Cir. 1939), to illustrate their point: "It is difficult to believe that Congress intended the same word, undefined in the act, to have different meanings in two contiguous sections. [108 F.2d at 214.]"

Although petitioners' arguments, on a first reading, have some appeal to logic, an examination of the underpinnings of such reasoning exposes the superficiality of such appeal and we are unpersuaded. Firstly, petitioners' reliance on *Hellmich v. Hellman, supra,* is misplaced. The Court did not purport to accord any specific technical meaning to the term "distribution." See *Baker v. United States, supra.* In *Hellmich* the Court reasoned that a redemptive distribution could not be embraced within the meaning of a technical statutory definition of a dividend, the purpose of which is to provide the specific characterization of the tax treatment accorded the distributee, on the basis of the use of a broad, statutorily undefined term when another statutory provision existed which applied specifically to redemptive distributions and required an entirely different tax characterization of a distributee's gain.

Secondly, petitioners' allegation that a misconstruction of the statute results from interpreting the contended phrase "any distributions" to have different meanings in sections 316(a)(1) and 316(a)(2), is erroneous. Indeed, the Supreme Court, in *Hellmich,* in explaining the reasons for its holding stated its application of "the long-established rule that the intention of the lawmaker is to be deduced from a view of every material part of the statute [Citation omitted.]." Our finding herein is in accord with that rule which has continued vitality. See *GPD, Inc. v. Commissioner,* 508 F.2d 1076, 1087 (6th Cir. 1974), revg. on other grounds 60 T.C. 480 (1973); *Estate of Wesley A. Steffke,* 64 T.C. 530, 534 (1975), affd. 538 F.2d 730 (7th Cir. 1976).

The term "distribution" has no technical fixed significance under the tax laws; nowhere in the statute is the term defined. We have no doubt that, contrary to petitioners' assertion, a proper application of the rules of statutory construction requires us to interpret this term of plain and general meaning in such a way as to give to it the meaning

commonly attributable to it, see *DeGanay v. Lederer*, 250 U.S. 376 (1919), rather than to construe it as having a specific meaning, see *Baker v. United States, supra.* Indeed, perhaps the most persuasive authority for our interpretation of the term "distribution" is found by an examination of the statutory context within which we are operating: Part I of subchapter C is titled "Distributions by Corporations" and almost every Code section within this part deals specifically with distributions. To ignore the existence of the term throughout part I in the statutory captions[48] and in the provisions themselves, used consistently therein to convey a general meaning, circumscribing our focus to one statutory subsection would be myopic.[49] We reject petitioners' attempt to impair our perception.

(2) Legislative history of section 316(a)(2).—Both parties, in extensive arguments, contend that the legislative history of section 316(a)(2) supports their respective positions and in fact respondent contends that the congressional intent in enacting section 316(a)(2) evidenced by this history should be dispositive of this issue.

Prior to the Revenue Act of 1936 a dividend was defined as a distribution out of earnings and profits accumulated since 1913 and distributions were deemed to have been made from the earnings and profits most recently accumulated. In two pre-1936 cases the Supreme Court defined and refined the meaning of accumulated earnings and profits for purposes of the dividend definition. The first, *Edwards v. Douglas*, 269 U.S. 204 (1925), interpreted accumulated earnings and profits

---

[48] See *Maguire v. Commissioner*, 313 U.S. 1 (1941); *Knowlton v. Moore*, 178 U.S. 41 (1900); *Helen M. Webb*, 67 T.C. 286 (1976); *John Bell Keeble, Jr.*, 2 T.C. 1249 (1943).

[49] Additionally we note respondent's reference to the portion of the majority opinion in *Baker v. United States, supra*, made in response to the same argument made by petitioners herein, which stated that to interpret "any distributions" as excluding redemptive distributions would thwart the statutory scheme of sec. 302 in that a redemption falling within sec. 302(d) could not be taxable under sec. 301(c)(1). See *Baker v. United States, supra* at 832. However, petitioners attempt to refute this argument by contending that the Supreme Court in *Hellmich v. Hellman*, 276 U.S. 233 (1928), did not exclude all redemptive distributions from the phrase "any distributions" but only those under sec. 302(a) which qualify for sale or exchange treatment. If petitioners were correct in their reading of the holding in *Hellmich* we would agree with them on this point (respondent also concedes as much on brief, see respondent's brief, p. 52). At any rate, we do not subscribe to that portion of the *Baker v. United States, supra,* opinion.

as including earnings and profits of the taxable year, computed as of the date of distribution. In the second case, *Mason v. Routzahn,* 275 U.S. 175 (1927), the Court affirmed the propriety of an administrative practice of the Treasury Department determining that a pro rata share of the entire year's current earnings may be treated as approximating the actual current earnings and profits for the fraction of the year prior to a distribution, for purposes of computing accumulated earnings and profits and applying the dividend definition to such distribution.

In the Revenue Act of 1936, Congress introduced a new level of corporate taxation, a surtax on undistributed profits. The purpose of the new tax was to discourage corporations, especially those controlled by taxpayers with large individual incomes, from accumulating surplus profits so as to escape the tax imposed on dividend income. See S. Rept. No. 2156, 74th Cong., 2d Sess. 2 (1936). See also *Fulman v. United States,* 545 F.2d 268 (1st Cir. 1976, 38 AFTR 2d 76–6232, 76–2 USTC par. 9777). The statutory scheme promulgated to implement the policy envisioned by the undistributed profits tax included the imposition of a surtax on the amount of corporate undis- tributed net income.[50] The statutory dividend definition was relevant in the scheme because the tax base, the undistributed net income, was computed by determining the corporation's adjusted net income and reducing that amount by the dividends-paid credit.[51] However, the statutory definition of a dividend, as augmented by the judicial gloss of the Supreme Court, included only distributions out of earnings and profits accumulated from 1913 to the date of distribution. Consequently, a corporation which had current earnings and profits but in an amount not in excess of its accumulated losses from prior years, thus having no, or deficit, accumulated earnings, could not receive the dividends-paid credit even though it might distribute those current earnings to its shareholders in accord with the spirit of the new law. To prevent this potential inequity Congress added section

---

[50] See sec. 14, Revenue Act of 1936.
[51] See secs. 14 and 27, Revenue Act of 1936.

115(a)(2) to the Code enlarging the definition of a dividend to include distributions out of current earnings and profits:

In order to enable corporations without regard to deficits existing at the beginning of the taxable year to obtain the benefit of the dividends paid credit for the purposes of the undistributed profits surtax, section 115(a) changes the definition of a dividend so as to include distributions out of the earnings or profits of the current taxable year. The amendment simplifies the determination by providing that distributions during the year, not exceeding in amount the current earnings, are dividends constituting taxable income to the shareholder and a dividends paid credit to the corporation. As respects such dividends the complicated determination of accumulated earnings or profits is rendered unnecessary. [S. Rept. No. 2156, *supra* at 18.]

With this legislative history in mind we return to a discussion of the parties' controversy which still centers on the meaning of the phrase "any distributions" as used in section 316(a)(2).

Respondent points to the above-quoted language of the Senate report and contends it is clear that Congress intended the new dividend definition to serve two purposes:

(1) To insure that distributions out of current earnings constituted taxable income to the shareholders in the form of dividends and allow a deficit corporation a credit therefor; and

(2) to obviate the necessity of making the complicated computation involved in determining the existence of accumulated earnings and profits at the time of a distribution.

Respondent notes that the 1936 amendment allowing dividends to be distributed from current earnings and profits did not extend to redemptive distributions; their source remained the same—the capital account and *accumulated* earnings. Secs. 312(e) and 312(a). See *St. Louis Co. v. United States,* 237 F.2d 151 (3d Cir. 1956), cert. denied 352 U.S. 1001 (1957). Respondent then concludes that to adopt petitioners' interpretation seeking to exclude redemption distributions from the meaning of "any distributions" and thus reducing current earnings available for dividends by the proper charge thereto for redemptive distributions, would frustrate the explicitly stated purposes for the enactment of section 316(a)(2). Only by adopting his interpretation, argues the respondent, can both intended purposes be effectuated.

Petitioners view the significance of the legislative history of section 316(a)(2) in a much different light from that of respondent. Petitioners argue that the purpose for the 1936 enactment of section 115(a)(2) was to make available to deficit corporations current earnings and profits as a source for ordinary dividend distributions and the dividends-paid credit. Petitioners cite *St. Louis Co. v. United States, supra,* as authority for the proposition that the new source of earnings and profits created by the 1936 Act was not available for purposes of redemptive distributions made under the predecessor of section 302(a). Petitioners conclude that, in light of the above, it would have been meaningless for Congress to create a new pool of current earnings and profits out of which ordinary dividend distributions could come and at the same time state that such pool was not to be reduced by redemption distributions when such pool was not available as a source for such redemption distributions anyway. Petitioners argue that, accordingly, the phrase "any distributions" used in section 316(a)(2) should be given the same interpretation as was given the phrase as used in section 316(a)(1) by the Supreme Court in *Hellmich.*

We reject petitioners' argument. The *St. Louis Co.* case, although decided in 1956, correctly indicated that redemptive distributions were not within the scope of the amended dividend definition under the 1939 Code; the charge to earnings and profits which resulted from a redemption continued to be to earnings and profits accumulated to the date of distribution. See also *Van Norman Co. v. Welch,* 141 F.2d 99 (1st Cir. 1944); *Shellabarger Grain Products Co. v. Commissioner,* 146 F.2d 177 (7th Cir. 1944), affg. 2 T.C. 75 (1943). However, to ascribe to the *St. Louis Co.* opinion the meaning sought herein by petitioners would be erroneous. The court in *St. Louis Co.* merely held that a redemption distribution, which was admittedly made with funds earned during the year of distribution, did not qualify under the special provisions of section 27 of the 1936 Act for the dividends-paid credit. To read more into the holding of that case would be unwarranted; we refuse to do so and find petitioners' reliance thereon misplaced.[52]

---

[52] See also the Eighth Circuit's response to this argument in *Baker v. United States, supra* at 834.

Moreover, as pointed out in *Baker v. United States, supra* at 834, even though the stated purpose for the enactment of section 115(a)(2) was to deal with a problem encountered by deficit corporations, the scope of the section was not so limited. Section 115(a)(2) applied in cases of nondeficit corporations and clearly a redemption distribution made by such a corporation with its attendant charge to accumulated earnings and profits, as defined in *Edwards v. Douglas, supra,* would reduce the amount of current earnings and profits as defined by section 115(a)(2). Petitioners' attempt to circumvent the reasoning is fruitless. They argue that section 115(a)(2) was irrelevant to redemption distributions by nondeficit corporations because section 27(f) allowed a dividends-paid credit so long as the distributing corporation had accumulated earnings and profits. However, the petitioners' use of the phrase "accumulated earnings and profits" is misleading because, as noted above, this phrase as interpreted by the Supreme Court included current earnings accumulated to the date of distribution.

Also, we agree with respondent that the clear congressional purpose of eliminating the complicated computation of accumulated earnings and profits when determining a dividend from current year's earnings would be frustrated if redemption distributions were excluded from the scope of the language in section 316(a)(2).

Petitioners, apparently as an alternative argument, urge us not to be concerned with obsolete congressional statements of intent contained in the legislative history of section 316(a)(2). They argue that the framework within which this section had its origin, the undistributed profits tax, has long since been repealed and contend that to impose the rules of that section on the current factual situation, one to which Congress clearly never directed its attention, would be erroneous.

We believe there is merit to petitioners' contention. We wish to make clear that our conclusion is based upon the entire analysis discussed above. Although we find the intent of Congress *at the time of enactment* of section 115(a)(2) to be supportive of our discussion and helpful in determining the issue herein, we would be reluctant in the extreme to agree with respondent that said intent should be dispositive of the priority question at issue herein. It is clear that Congress,

when promulgating section 115(a)(2), did not consider a factual situation such as the one at bar. However, such a circumstance is not so uncommon and indeed, determining what Congress would have intended had they considered a particular situation is an important part of the role played by the judiciary. Nonetheless, interpreting or determining purported congressional intent is a delicate process to be exercised thoughtfully with extreme care. Consequently, we believe it best to move beyond a simple examination of the intention of Congress in 1936.

Following the repeal of the undistributed profits tax,[53] since at least 1941, a number of scholars have focused attention on the current earnings test for dividends contained in section 316(a)(2) and called for its repeal characterizing it as an anachronism.[54] Yet since then, Congress, with numerous opportunities for legislative change, has not seen fit to alter this statutory definition. We believe this action or inaction bespeaks of a congressional intent. Indeed an examination of the historical development of section 316 and the entire part I of subchapter C, dealing with the taxation of corporate distributions, makes obvious a sense of distinct congressional purpose: To tax distributions as dividends to the greatest extent possible and allow other preferential tax treatment only where the circumstances clearly fall within a carefully carved exception. Section 316(a)(2) has been a part of the tax statute for 40 years; 37 years after the repeal of its purported reason for existence. Regardless of its original purpose, it would appear that Congress, through the retention of this section, has substituted a new purpose for this section in order to encourage the underlying tax policy embodied in the intricately integrated provisions of subchapter C, part I.[55] It is

---

[53] The tax was repealed by the Revenue Act of 1939.

[54] See, for example, Rudick, " 'Dividend' and 'Earnings or Profits' Under Income Tax Law: Corporate Non-Liquidating Distributions," *supra* at 904.

[55] It is argued that sec. 316(a)(2) presently serves no useful purpose and should be repealed because sec. 316(b)(2) now serves the purpose of providing a dividend-paid credit for personal holding companies. We note, however, that sec. 316(b)(2), as well as sec. 316(b)(3) recently enacted as sec. 1601 of the Tax Reform Act of 1976, both use the phraseology, "The term 'dividend' *also* means any distribution of property. [Emphasis added.]" This suggests that Congress was well aware of the continued presence of sec. 316(a)(2) in the Code and in its effort to clear out all "dead wood" provisions would have repealed sec. 316(a)(2) had it been thought to serve no useful purpose. In any event sec. 316(a)(2) is still in the law and we cannot ignore it.

in light of this underlying congressional intent that we perform our function in deciding the issue herein.

(3) Interrelationship of sections 316(a)(2) and 312(a).—The final argument made by petitioners is an attempt to persuade us that as a result of reading section 316(a)(2) and section 312(a), a section 302(a) redemption distribution is entitled to a charge against current earnings and profits, accumulated to the day of distribution, prior to a charge thereto for ordinary dividend distributions.

Petitioners argue that in the case of a section 302(a) redemption, section 312(a) governs the amount of the distribution, which is not properly chargeable to capital under section 312(e), which will reduce earnings and profits. They contend that section 312(a) serves a dual purpose, not only does it specify the amount of a reduction to earnings and profits from a distribution but also indicates the time such reduction is to be made. They interpret the phrase "on the distribution" to mean *at the time of* the distribution. Petitioners assert that a clear statutory conflict will exist if we hold that the language of section 316(a)(2), postponing a reduction to current earnings until an end-of-the-year computation for their availability for ordinary distributions, applies to such redemption distributions.

Respondent agrees, as do we, that section 312(a) applies to determine the amount of the reduction to earnings and profits from a section 302(a) distribution. However, respondent argues that the phrase "on the distribution" in section 312(a) was used in the descriptive sense to mean "because of" or "on account of" and does not specify a point in time at which the earnings and profits account is to be reduced.[56] To illustrate his position, respondent offers an example of an ordinary cash distribution by a corporation which has only current earnings and profits and concludes that since section 316(a)(2) clearly prohibits any reduction to earnings and profits from a distribution made during the year, section 312(a) cannot be interpreted as containing a timing rule for reduction of earnings and profits.

---

[56] Sec. 311(a) which, per se, does not provide a timing rule also uses the terminology "on the distribution, with respect to its stock."

The phrase in section 312(a) "on the distribution" is one which is certainly amenable to either of the interpretations proposed by the parties herein. An examination of the legislative history of section 312 suggests that the phrase "on the distribution" is to be read as providing a time rule for the reduction of earnings and profits.[57] The following example contained in the legislative history indicates that Congress, in enacting section 312(a), contemplated that such section would determine the timing of a reduction to earnings and profits:

Thus, in the preceding example, if the fair market value of property at the time of distribution was $150, and the earnings and profits of the distributing corporation, immediately prior to the distribution were $120, the amount taxable as a dividend under section 301 and 312(a) would be $120. * * * The remainder of the distribution would be applied against basis under section 301(b)(2). The earnings and profits of the distributor immediately after the distribution would be $20 ($120 minus $100, the adjusted basis of the property.) [H. Rept. No. 1337, 83d Cong., 2d Sess. A94 (1954).]

However, acceptance of petitioners' interpretation of section 312(a) would seemingly give rise to a conflict with the clear statutory language of section 316(a)(2).

But assuming that section 312(a) does provide a timing rule, the conflict is not, and cannot be, insurmountable. Both provisions are in the law, and we cannot ignore either of them; rather, we must attempt to reconcile them in such a way as to accomplish what we deem to be in accord with the overall scheme of Congress with respect to taxing distributions from corporations. In doing so, we must give due consideration to every material part of the statute. *Hellmich v. Hellman, supra.*

Section 312(a) provides a rule of general application to determine the effect of corporate distributions, including both dividends and redemptions, upon the earnings and profits of the distributing corporation. Section 316(a)(1) supplies a general definition of the term "dividend" as being any distribution of property out of earnings and profits *accumulated* after February 28, 1913. Section 316(a)(2) supplies a special rule for determining the amount of the taxable year's earnings and profits that is available for and must be

---

[57] See also sec. 1.301–1(b), Income Tax Regs.

classified as dividends for purposes of section 301(c). In other words, section 316(a)(2) provides a special rule of computation which artificially preserves the full taxable year's earnings and profits for the purpose of calculating the current earnings and profits available for ordinary distributions.

Where the corporation making both dividend and redemption distributions in the taxable year had no accumulated earnings and profits at the beginning of the taxable year, we believe the timing rule of section 316(a)(2), which applies specifically to current earnings and profits, takes precedence over the general timing rule of section 312(a), if such it is. See *Hellmich v. Hellman, supra; Michael C. Callan,* 54 T.C. 1514 (1970), affd. per curiam 476 F.2d 509 (9th Cir. 1973). This means that if the corporation referred to above has insufficient earnings and profits during the taxable year to cover both the dividend and the redemption distributions the dividend distributions are to be charged first to the current year's earnings and profits, determined as of the end of the taxable year without diminution by reason of any distributions during the year, either ordinary or redemption distributions. *Baker v. United States, supra* at 832. The dividend distributions are includable in the gross income of the distributees under section 301(c) to the full extent of the earnings and profits of the taxable year as computed above. If there is any excess of current earnings and profits after the dividend distributions have been charged thereto, the excess will be added to accumulated earnings and profits for purposes of applying sections 316(a)(1) and 312(a). If there was a pretaxable year deficit in the earnings and profits account, we assume that the excess of current year's earnings and profits would be offset against the deficit and the redemption distributions would be charged against any balance that may remain. Appreciation of this procedure would, in our opinion, not only give cognizance to both sections 312(a) and 316(a)(2) and bring them into harmony but would also accomplish what we consider to be the basic intent of Congress to tax fully as ordinary dividends all distributions to stockholders out of current year's earnings and profits.

Consequently, we hold that to the extent of Associates' earnings and profits generated during its taxable year ended March 31, 1971, the cash distributions made by Associates to

its shareholders, including those made as of February 9, 1971, were dividends as defined in section 316(a)(2), includable in the gross income of the distributees under section 301(c). The distributions made by Associates during its taxable year ended March 31, 1972, are likewise includable in the income of the recipients as dividends to the extent of Associates' earnings and profits.

In accordance with out conclusions herein and the concessions of the parties,

*Decision will be entered under Rule 155.*